LUCE & COMPANY, S. EN C., recurrente, *v.* JUNTA DE SALARIO MÍNIMO DE PUERTO RICO, recurrida.

Núm. 11.—*Sometido:* Junio 21, 1943. *Resuelto:* Septiembre 23, 1943.

454

 

*Hartzell, Kelley & Hartzell* y *J. L. Novas,* abogados de la recurrente; *Hon. Procurador General Interino M. Rodríguez Ramos, Gabriel Guerra-Mondragón* e *Ismael Soldevila,* abogados de la recurrida; *Philip F. Herrick,* como *amicus curiae,* a nombre de los Estados Unidos de América.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

Invocando la facultad que le confiere la sección 10-A($^1$) de la Ley creando una Junta de Salario Mínimo en el Departamento del Trabajo (Leyes núms. 8 de 1941, pág. 303, y 44 de 1942, pág. 477), el Gobernador de Puerto Rico, en boletín administrativo número 805, expidió una proclama promulgada el 29 de julio de 1942, requiriendo a la Junta de Salario

---

($^1$) ''Sección 10-A.—No obstante lo dispuesto en otras secciones de esta Ley, el Gobernador de Puerto Rico, mediante proclama al efecto, podrá requerir en cualquier momento de la Junta de Salario Mínimo que nombre un Comité de Salario Mínimo para investigar las condiciones de trabajo que prevalecen en determinada ocupación, negocio o industria en que exista o haya existido dentro de los seis (6) meses anteriores a la fecha de la proclama del Gobernador, un estado de huelga, paro patronal, emergencia o controversia entre obreros y patronos sobre salarios, y fije los salarios mínimos que deberán pagarse en la ocupación, negocio o industria en cuestión.

''El Gobernador, al emitir la proclama que se provee en esta sección, hará constar que los salarios que la junta fijare tendrán efecto retroactivo a la fecha en que los trabajadores se hayan reintegrado o se reintegraren al trabajo.

''La Junta de Salario Mínimo, una vez así requerida por el Gobernador, procederá inmediatamente a nombrar el Comité de Salario Mínimo, el cual, después de la debida investigación de la ocupación, negocio o industria de que se trate, procederá a informar a la junta sus conclusiones de acuerdo con las disposiciones de la sección 6 de esta Ley en lo que respecta a salarios; *Disponiéndose, sin embargo,* que en estos casos el Comité de Salario Mínimo deberá rendir informe a la junta dentro del término de quince (15) días o de la prórroga que en casos justificados le concediere la Junta.

''En caso de que el comité así nombrado no rindiere su informe dentro del término señalado o de la prórroga que se le concediere, o en caso de que sus

Mínimo que nombrase un Comité de Salario Mínimo para investigar las condiciones de trabajo prevalecientes en la industria azucarera de Puerto Rico, a fin de que la junta pudiera fijar los salarios mínimos que deban pagarse a los obreros en dicha industria. En la referida proclama el Gobernador expresó que era de conocimiento público que al dar comienzo a la zafra de 1941–42 existió un estado de huelga entre gran parte de los obreros que se empleaba en la industria azucarera y que dichos obreros regresaron a sus trabajos en el entendido de que la Junta de Salario Mínimo estudiaría la industria azucarera de Puerto Rico y fijaría salarios mínimos adecuados. Se hizo constar, además, en la proclama, conforme requiere la citada sección 10-A, que los salarios que la junta fijase tendrían efecto retroactivo a la fecha en que los trabajadores se reintegraron a sus trabajos, fecha que habría de determinarse por la junta.

En sesión ejecutiva celebrada el 14 de agosto de 1942, la junta nombró el comité previo aviso publicado en la prensa requiriendo a los patronos y a los trabajadores de la indus-

miembros no lograren ponerse de acuerdo y rendir un informe por votación de mayoría, la junta podrá declarar disuelto dicho comité y designar otro para la investigación e informe correspondiente o podrá llevar a cabo la investigación por sí misma y redactar el informe correspondiente como si se tratara del informe del Comité de Salario Mínimo; *Disponiéndose, además,* que el informe rendido en este último caso quedará sujeto al mismo procedimiento ulterior que se establece en la presente Ley.

"Una vez rendido el informe del Comité de Salario Mínimo o de la Junta, si ésta hubiere llevado a cabo la investigación y redactado el informe, se seguirá el procedimiento que señala la ley para dictar un decreto mandatorio sobre salarios; *Disponiéndose, sin embargo,* que dicho procedimiento quedará sujeto a las siguientes disposiciones especiales:

"(a) Que el aviso para la audiencia pública requerido por la sección 9 de esta Ley deberá publicarse por lo menos con cinco (5) días de anticipación a la celebración de la misma.

"(b) Que el decreto mandatorio que deberá dictar la junta, de acuerdo con la sección 10 de esta Ley, será efectivo inmediatamente y tendrá además efecto retroactivo en cuanto a los salarios fijados a la fecha en que los trabajadores de la industria en cuestión se hayan reintegrado o se reintegraren al trabajo, si es que ese hecho ha ocurrido con anterioridad a la promulgación del decreto por la junta. La Junta determinará la fecha del retorno de los obreros a su trabajo."

tria que sometiesen candidatos con ese objeto. El comité quedó constituído en la siguiente forma: dos miembros en representación de los patronos, habiendo sido propuesto uno de ellos por la Asociación de Productores de Azúcar y el otro por la Unión de Agricultores de Puerto Rico; dos en representación de los obreros, propuestos por la Confederación General de Trabajadores de Puerto Rico y por la Federación Libre de los Trabajadores de Puerto Rico, respectivamente, y uno en representación de los intereses públicos, quien actuó como presidente del comité.

La junta, estimando conveniente nombrar además un Comité de Salario Mínimo de conformidad con la sección 6(²) de la ley, a fin de investigar las necesidades normales de los trabajadores empleados en dicha industria, el número de horas de labor por día y las condiciones de trabajo requeridas para la conservación de su salud, seguridad y bienestar, en sesión celebrada el 21 de agosto de 1942 nombró dicho Comité quedando integrado por las mismas personas que componían el nombrado a virtud de la proclama del Gobernador.

---

(²) ''Sección 6.—Si en cualquier ocupación, negocio, o industria, o en cualquier operación, rama, proceso o actividad de los mismos, los salarios que se pagan son insuficientes para satisfacer las necesidades normales de los trabajadores y perjudiciales a la conservación de las normas mínimas de vida necesarias para la salud, la eficiencia y el bienestar general de los mismos, será deber de la junta nombrar un Comité de Salario Mínimo compuesto de dos representantes de los patronos a propuesta de éstos y dos representantes de los trabajadores de dicha ocupación, negocio o industria, o de la operación, rama, proceso o actividad de dicha ocupación, negocio o industria, que serán propuestos por los trabajadores y de un quinto miembro en representación de los intereses públicos, quien actuará como presidente del comité.

''Los miembros de tal Comité de Salario Mínimo percibirán una dieta de cinco (5) dólares cuando se reúnan en funciones oficiales y se les pagarán los gastos de viaje necesarios para el desempeño de su cometido.

''La junta promulgará las reglas y reglamentos concernientes a la selección de los miembros de estos comités y al procedimiento a seguirse por los mismos, y tendrá exclusiva jurisdicción sobre todas las cuestiones que surjan en cuanto a la validez del procedimiento y a las recomendaciones que hagan dichos comités. Los procedimientos y deliberaciones de los comités de salario mínimo serán por escrito para el uso de la junta y serán admisibles como evidencia en cualquier procedimiento ante la junta.

Previos los avisos correspondientes, publicados en la prensa, el comité celebró audiencias durante varios días de los meses de agosto y septiembre de 1942, en el curso de las cuales recibió prueba documental y el testimonio de numerosas personas representativas tanto de los obreros como de los patronos sobre las condiciones de trabajo prevalecientes en la industria. Terminadas las audiencias públicas, el comité se reunió en sesión ejecutiva y rindió luego dos informes a la junta: uno haciendo recomendaciones de conformidad con la sección 10-A acerca de los salarios que deberían pagarse en la industria del azúcar a partir del 16 de febrero de 1942, fecha en que los obreros en huelga se reintegraron a sus trabajos, y otro de acuerdo con la sección 6, recomendando los mismos salarios y además horas de labor y condiciones de trabajo, este último con carácter prospectivo.

Recibidos por la junta los referidos informes, procedió ésta a distribuir copias de ellos a las partes interesadas y a todas aquellas personas que los solicitaron, publicándolos

"La junta facilitará a los comités de salario mínimo servicios adecuados de abogados, contables, taquígrafos, oficinistas, y demás personal que fuere necesario para llevar a cabo su labor.

"A requerimiento de la junta, será deber de todo Comité de Salario Mínimo investigar las condiciones de trabajo que prevalecen en las ocupaciones, negocios o industrias de que se trate, e informar a la junta sus conclusiones, que incluirán lo siguiente:

"(1) Un estimado del salario mínimo indispensable para satisfacer las necesidades normales de los trabajadores empleados en la ocupación, negocio o industria en cuestión y conservar las normas mínimas de vida necesarias para la salud, la eficiencia y el bienestar general de los mismos.

"(2) El número de horas de labor por día en la ocupación, negocio o industria en cuestión consistente con la salud, seguridad y bienestar de tales trabajadores.

"(3) Las condiciones de trabajo requeridas para la conservación de la salud, la seguridad y el bienestar de los trabajadores en dicha ocupación, negocio o industria.

"Todo comité de salario mínimo rendirá informe a la junta dentro del término de tres (3) meses, o de la prórroga que en caso justificado le concediere la junta. En caso de que un comité de salario mínimo no rindiere su informe dentro del término señalado, o de la prórroga que se le concediere, o en caso de que sus miembros no lograren ponerse de acuerdo y rendir un informe por votación de mayoría, la junta podrá declarar disuelto dicho comité y nombrar otro para hacer la investigación e informe correspondientes."

458

además en la prensa diaria con más de diez días de antelación a la fecha señalada para una audiencia que principió el 25 de noviembre de 1942 y se prolongó hasta el 18 de diciembre siguiente.

Comparecieron a la audiencia obreros y patronos, representantes de sus respectivas organizaciones, y otras personas interesadas en la industria azucarera. En la vista se presentó extensa evidencia con respecto a las condiciones generales de la industria, del importe de los salarios, horas de labor, condiciones de trabajo, costes de producción, mercadeo, transporte, seguros y situación económica y financiera de la industria. Como resultado de esta evidencia, la junta, el 27 de febrero de 1943, promulgó los decretos números 2 y 3. El decreto número 2 fijó los salarios tanto para la fase agrícola como para la industrial, haciendo constar que empezaba a regir inmediatamente y que sus efectos se retrotraían al 16 de febrero de 1942. El decreto número 3 fijó exactamente los mismos salarios que el número dos para una y otra fase de la industria azucarera([3]), dictó reglas respecto a las horas de labor tanto diarias como semanales, y además sobre condiciones de trabajo, viviendas, predios de terreno, y comidas servidas por el patrono a sus obreros en el curso del empleo. Expresamente proveyó que ninguna de las condiciones contenidas en el decreto excusaba el incumplimiento de estipulaciones contenidas en convenios colectivos celebrados entre patronos y obreros ni el de disposiciones de leyes a virtud de las cuales se fijaren salarios más altos o menos horas de

---

([3]) Tanto en uno como en otro decreto, en lo que respecta a la fase agrícola de la industria, se establecen dos escalas de salarios: una más alta para ''fincas no pequeñas y que no sean del interior'', y otra más baja que la anterior para ''fincas pequeñas y del interior''. Esa clasificación no es arbitraria ni discriminatoria. Por el contrario, tiende a evitar que la determinación de salarios resulte injusta y opresiva para el agricultor de fincas pequeñas del interior, cuyos terrenos generalmente son menos productivos que los de las fincas del litoral, por ser estos últimos más apropiados para el cultivo de la caña. Tan razonable es esta clasificación que desde hace mucho tiempo ha sido seguida en los convenios colectivos que anualmente celebran obreros y patronos, al igual que en la determinación de salarios para el año 1943, promulgada de acuerdo con el estatuto federal, la cual también tiene dos escalas de salarios análogas.

labor, o condiciones de trabajo adicionales o más ventajosas que las fijadas en el decreto. Los dos decretos fueron publicados en la prensa diaria el 27 de febrero de 1943. Un gran número de patronos radicaron sendas mociones de reconsideración, las que fueron desestimadas luego que la junta celebró una audiencia en la que fueron oídas las partes interesadas. Fué entonces que se radicaron en este Tribunal ochenta y tres recursos de revisión de conformidad con la sección 24 de la ley.([4])

■ *La principal cuestión que suscitan los recurrentes es que la Ley Federal titulada "Sugar Production and Control", 7 U.S.C.A., secciones 1100 et seq., excluye la Ley Insular núm. 8 de 1941, según ha sido enmendada, en cuanto dicha Ley Insular pueda afectar la industria del azúcar.*

Para que pueda sostenerse que el estatuto Federal excluye una ley insular encaminada a proteger la salud y bienestar del público, no basta que las dos leyes abarquen la misma materia. Es preciso que la ley insular por sus propios términos o en su administración práctica esté en conflicto con la ley del Congreso o manifiestamente infrinja la política pública de la ley Federal. En el caso de *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 82 L. ed. 235, se dijo:

"En el curso de la opinión emitida por esta corte en *Davis* v. *Beason*, supra [133 U.S. 333, 33 L. ed. 642, 10 S. Ct. 299] (pág. 348),

---

([4]) "Sección 24.—(a) En todo proceso por violación de cualquiera de las disposiciones de esta Ley de Salario Mínimo, el máximo de horas de labor y las condiciones de trabajo fijados por la junta como aquí se determina, se considerarán *prima facie* que son razonables y legales y que constituyen el salario de vida, el máximo de horas de labor y las condiciones de trabajo que requiere esta Ley.

"(b) Las conclusiones de hecho a que llegue la junta actuando dentro de sus poderes será, en ausencia de fraude, concluyente; *Disponiéndose*, que cualquier persona perjudicada directa o indirectamente por cualquier decreto o regla de la junta, puede solicitar de ésta una reconsideración dentro de los veinte (20) días de haberse promulgado dicho decreto o regla. La solicitud de reconsideración debe hacerse bajo juramento y en ella se especificarán sus fundamentos; *Disponiéndose*, que sólo podrá concederse una reconsideración por una de las siguientes causas: que la junta actuó sin autoridad o en exceso de sus poderes; o que el decreto, regla u orden se obtuvo mediante fraude.

se dijo: 'Los casos en que la Legislación del Congreso, sin disposición específica a ese efecto, suplanta la legislación del Estado o Territorio, son aquellos en que la misma materia es objeto de legislación por uno y otro. En ese caso la acción del Congreso puede ser considerada como si cubriese la totalidad de la materia.' Esta generalización no era necesaria para la decisión del caso y tomada literalmente no puede prevalecer, porque, como en el caso de *Gutiérrez* [215 U.S. 87], *omite el elemento de verdadero conflicto entre las dos piezas de legislación.*" (Pág. 270.) (Bastardillas nuestras.)

Véase al mismo efecto el caso de *Cloverleaf Co.* v. *Patterson,* 315 U. S. 148, y especialmente la opinión disidente del Juez Presidente Stone, a la pág. 170.

En el caso de *Parker et al.* v. *Brown,* (317 U. S. 341, 367) 87 L. ed. 235, 250, se va aun más lejos que en los anteriormente citados, al decirse:

"Esta historia demuestra con suficiente claridad que la adopción de medidas legislativas para evitar la desmoralización de la industria estableciendo el mercadeo de la cosecha de pasas, es una materia de interés tanto estatal como nacional, *y en ausencia de una acción inconsistente por parte del Congreso,* es un problema cuya solución radica peculiarmente dentro de las atribuciones del Estado. En el

"Contra la resolución final que dictare la junta sobre el particular, podrá solicitarse revisión ante el Tribunal Supremo de Puerto Rico dentro del término de quince (15) días después de su notificación. El tribunal podrá confirmar o desestimar la decisión de la junta; pero la desestimación sólo tendrá lugar por uno de los siguientes fundamentos:

"Que la junta actuó sin autoridad o en exceso de sus poderes; o que el decreto, regla u orden se obtuvo mediante fraude.

"(c) La radicación de una solicitud de reconsideración tendrá el efecto de suspender el decreto, regla u orden en cuestión únicamente en cuanto a la parte o partes promoventes y por un período que no excederá de veinte (20) días, a menos que la junta extienda el plazo de la suspensión, para lo cual se le confiere por la presente plenos poderes.

"(d) Establecido un recurso de revisión ante el Tribunal Supremo, será deber de la junta elevar a dicho tribunal los autos originales del caso, consistentes del informe (*findings*) del Comité de Salario Mínimo, el expediente de las audiencias celebradas por la junta, el decreto recurrido, la solicitud de reconsideración y la resolución dictada, así como cualquier otro procedimiento recaído en el caso.

"El recurso ante el Tribunal Supremo producirá la suspensión del decreto recurrido cuando mediare la prestación de una fianza para garantizar el pago total de los salarios envueltos en el recurso, más una cantidad razonable para honorarios en caso de que el tribunal desestimare el procedimiento."

ejercicio de su poder el Estado ha adoptado una medida apropiada al fin perseguido. El programa no fué dirigido a ni discriminó contra el comercio entre estados, *aunque sin duda afectó el comercio aumentando el precio interestatal de las pasas y reduciendo, hasta cierto punto indeterminado, el volumen de los embarques en el comercio entre estados.* El efecto sobre el comercio no es mayor y en algunos casos es mucho menor que aquellos en que esta Corte ha resuelto que no ofrece una base para denegar a los estados el derecho de perseguir un fin estatal legítimo. (Citas.)'' (Bastardillas nuestras.)

Se observará que no obstante admitirse en la cita que precede que la legislación estatal afectaba el comercio entre estados aumentando el precio de las pasas y reduciendo hasta cierto punto indeterminado el volumen de los embarques en el comercio interestatal, no obstante tales circunstancias, repetimos, el tribunal estimó que la interferencia entre la ley estatal y la federal no eran tan sustancial que impidiera la coexistencia de ambos estatutos. No hay duda, pues, que para que la ley federal excluya la insular, no basta que las dos leyes abarquen la misma materia, sino que es preciso que la ley insular por sus propios términos o en su administración práctica esté en conflicto *sustancial* con la ley del Congreso o manifiestamente infrinja la política pública de la Ley Federal.

██ Establecido este principio, nuestro próximo paso será determinar si en efecto existe tal conflicto o si por el contrario ambas leyes, la federal y la insular, pueden armónicamente subsistir.

En sus alegatos, lo mismo que lo hicieron en sus informes orales, los recurrentes, al tratar de excluir toda posibilidad de legislación insular que pueda afectar la industria azucarera, parten de la premisa de que el estatuto federal es un todo armónico que abarca todas las fases de la industria azucarera y que cualquier intervención con su organización repercutirá en el ''delicadamente equilibrado organismo y sacará de balance toda la maquinaria reglamentadora.'' Tomando por base la supuesta delicada estructura, arguyen los

recurrentes que al fijar la junta un salario mínimo superior al determinado por el Secretario de Agricultura a virtud de la Ley Federal, podría afectar la producción en Puerto Rico y consecuentemente alterar la estabilización del mercado de azúcar en los Estados Unidos.

Si algo surge claramente de la Ley Federal en cuestión, es la perspicacia y discernimiento de sus autores, al dotarla de una flexibilidad tal que permite adaptarla a cualquier emergencia, confiriendo al Secretario de Agricultura a ese efecto una vasta discreción en la aplicación de sus distintas disposiciones. Así vemos, que la sección 1111 establece las normas para que el Secretario pueda determinar la cantidad de azúcar necesaria para hacer frente al consumo de ese artículo en los Estados Unidos continentales; que la sección 1112 le confiere facultades para fijar las cuotas tanto para las áreas domésticas como para las extranjeras; que la 1113 se la concede para determinar la cantidad de azúcar que se requerirá para hacer frente al consumo local en Hawaii y Puerto Rico; y por último, que la 1114 le autoriza a hacer la redistribución que fuere conveniente para cubrir un déficit, ya sea en alguna de las áreas domésticas o en las extranjeras.

Es verdad que en la actualidad el sistema de cuotas ha sido temporalmente suspendido, pero tampoco afecta la estabilización del mercado, porque se ha fijado por la Oficina de Administración de Precios (OPA), haciendo uso de la autoridad conferídale por el "Emergency Price Control Act", un precio al azúcar de $3.74 por quintal(5), y cualquier deficiencia en la aportación de ese artículo procedente de Puerto Rico fácilmente podría ser suplida por las demás áreas de producción. Desde luego que, a los efectos del argumento estamos asumiendo, contra la presunción legal de que la

---

(5) El apartado 6 del decreto número 3 dispone que en el caso de que el precio del azúcar subiese o bajase de $3.74, el aumento o rebaja será distribuído a base del 50 por ciento para el agricultor o productor, y 50 por ciento entre los obreros de dicho agricultor o productor, medida que nos parece razonable si tenemos en cuenta el propósito de la Ley y la circunstancia de que, según determinó la Junta, 45 por ciento del costo de producción corresponde al pago de salarios.

junta cumplirá su deber, que ésta habrá de señalar jornales tan altos que perjudiquen la producción en Puerto Rico. Quizá sea conveniente consignar aquí que según los cálculos de la Junta de Salario Mínimo de Puerto Rico el aumento de salarios prescrito para la fase agrícola por los decretos que nos ocupan es aproximadamente un 14.9 por ciento más alto que el fijado por el Secretario de Agricultura para 1942, y el decretado para la fase industrial equivale a un 9.5 por ciento sobre los salarios que se venían pagando a través del convenio colectivo firmado con la Federación Libre de Trabajadores de Puerto Rico. Ese aumento de salarios equivale a un 1.5 por ciento sobre el coste total de producción de 1942 de acuerdo con los estimados de la Junta.

El estatuto federal, bajo el subcapítulo III titulado "Disposiciones sobre Pago Condicional", impone como condición precedente a aquellos agricultores que quieran recibir subsidio, que den cumplimiento a ciertas restricciones en relación con el trabajo de menores; que paguen el salario mínimo fijado por el Secretario de Agricultura y lleven a cabo ciertas prácticas agrícolas tendentes a conservar y mejorar la fertilidad del suelo, y otras prácticas consistentes con las normas razonables establecidas en la comunidad donde radique la finca.

El fin perseguido por la Ley Federal al fijar un salario mínimo es impedir que se pague un salario inferior al así fijado, pero no que se pague uno superior razonable en beneficio del obrero. De ahí que al anunciar los salarios mínimos para el año natural corriente, se prescriba por la Administración de Alimentos de Guerra, en el Parte 802, titulado "Determinación de salarios justos y razonables para personas empleadas en la producción, cultivo y recolección de cañas de azúcar durante el año calendario 1943", promulgado. el 25 de junio de 1943 bajo el epígrafe "Disposiciones Generales":

"Si el productor y el trabajador acuerdan un tipo de salario por cualquier clase de trabajo *más alto* que el que se prescribe aquí, *el*

*pago en su totalidad del tipo convenido* deberá ser hecho para que el productor pueda calificar para recibir su pago condicional.'' (Bastardillas nuestras.)

No habiéndosenos demostrado que entre la ley federal y la insular, ni en la administración de ambos estatutos, exista conflicto sustancial no obstante los dos cubrir la misma materia, forzoso es concluir que uno y otro pueden válidamente coexistir.

■ 2. *Los recurrentes atacan la validez de la Ley núm. 8 de 1941, alegando que contiene una inconstitucional delegación de poderes, al no fijar limitación o normas adecuadas para el ejercicio de los poderes delegados a la Junta y a los Comités de salario mínimo.*

La ley en cuestión, en su sección 12, conforme fué enmendada por la Ley núm. 9 de 20 de marzo de 1942 (pág. 301), establece las normas a que debe adjustarse la junta en la administración de la ley. En lo pertinente dice así:

''Sección 12.—Al fijar el salario mínimo, la junta deberá tomar en consideración el coste de producción, la situación financiera y económica de las industrias o ramas de la producción afectadas, las fluctuaciones de mercado, así como las condiciones especiales existentes en la zona o región de que se trate.

''*Previa recomendación del correspondiente Comité de Salario Mínimo, la junta podrá clasificar los trabajos en cualquier ocupación, negocio o industria de acuerdo con la naturaleza de los servicios a rendir y aprobar escalas de salarios mínimos apropiados para distintas clases de trabajo, con el objeto de fijar para cada clasificación el tipo más alto de salario mínimo compatible con los propósitos de esta Ley. La junta podrá aprobar también salarios mínimos diferentes para distintas zonas o regiones, cuando a juicio de la junta tal diferenciación sea aconsejable debido a las condiciones existentes en dichas zonas o regiones, siempre que tal acción no conceda ventaja de competencia a otra u otras zonas o regiones; Disponiéndose, sin embargo,* que al aprobarse el salario mínimo para una ocupación, negocio o industria el tipo fijado será uniforme para toda ocupación, negocio o industria de la misma clase, categoría, o importancia en la *zona o región de que se trate.*

'' ❋ ❋ ❋ ❋ ❋ ❋ ❋

"En la industria azucarera, y en cualquiera otra industria, negocio u ocupación en que sea posible hacerlo, la junta fijará la relación básica que deba existir entre el precio del producto y los salarios, bien por promedios quincenales o mensuales de dicho precio, o por cualquier otro medio que la junta considere adecuado para cumplir los fines de esta Ley, con miras a la justicia para los trabajadores y a la estabilidad y prosperidad de las industrias."

En lo que respecta a los Comités de Salario Mínimo, la sección 6 fija las normas que deberán éstos seguir al hacer sus recomendaciones a la Junta. En lo pertinente, dicha sección 6 dice:

"A requerimiento de la junta, será deber de todo Comité de Salario Mínimo investigar las condiciones de trabajo que prevalecen en las ocupaciones, negocios o industrias de que se trate, e informar a la junta sus conclusiones, que incluirán lo siguiente:

"(1) Un estimado del salario mínimo indispensable para satisfacer las necesidades normales de los trabajadores empleados en la ocupación, negocio o industria en cuestión y conservar las normas mínimas de vida necesarias para la salud, la eficiencia y el bienestar general de los mismos.

"(2) El número de horas de labor por día en la ocupación, negocio o industria en cuestión consistente con la salud, seguridad y bienestar de tales trabajadores.

"(3) Las condiciones de trabajo requeridas para la conservación de la salud, la seguridad y el bienestar de los trabajadores en dicha ocupación, negocio o industria."

Parece que los recurrentes, impresionados sin duda por la circunstancia de que en el estatuto federal titulado "Fair Labor Standards Act", interpretado en *Opp Cotton Mills Inc.* v. *Administrator,* 312 U. S. 126, 85 L. ed. 624, el Congreso tuvo a bien disponer que el salario mínimo que debía fijar el Administrador no debía ser menor de 30 centavos ni exceder de 40 centavos por hora, creen que una limitación semejante es indispensable en el presente caso para que la delegación de poderes sea válida.

A este efecto conviene reproducir aquí lo dicho por el Profesor Burdick en su obra "The Law of the American Constitution", pág. 152:

"Las condiciones actuales, con su gran complejidad de relaciones personales y domésticas, juntamente con la progresiva supervisión gubernativa sobre la conducta de los individuos y especialmente de las corporaciones, en beneficio de la comunidad en general, han hecho prácticamente imposible a las legislaturas legislar sobre la minuciosa aplicación de las reglas y reglamentos que se suelen adoptar. Además, esa aplicación puede ser hecha más satisfactoriamente por personas expertas en los distintos campos, que dediquen su tiempo a la consideración de los problemas dentro de sus especialidades. Estas consideraciones han inducido a las legislaturas a delegar una gran parte del poder que ellas podrían ejercitar, en funcionarios y juntas administrativas, y esto pueden hacerlo sin violar la Constitución, siempre que dicten las normas y solamente encomienden a la agencia administrativa la aplicación de esas normas o principios a los hechos que puedan surgir.

"*La autoridad así delegada puede ser muy amplia, y las normas que han de regir pueden exponerse en los términos más amplios.*" (Bastardillas nuestras.)

Así vemos que en el estatuto federal titulado "Communications Act" de 1934, las normas a seguir por la "Federal Communications Commission" se exponen en la sección 303 de la ley en los siguientes términos:

"Excepto como de otro modo se provee en esta ley, la Comisión, de tiempo en tiempo, *conforme lo requieran la conveniencia, el interés o las necesidades públicas,*

"(a) clasificará estaciones de radio;

"(b) prescribirá la naturaleza del servicio que deberá ser prestado por cada clase de estaciones autorizadas y por cada estación de cualquier clase; . . .

" * * * * * * *

"(f) hará aquellos reglamentos no inconsistentes con la ley que puedan estimarse necesarios para impedir interferencias entre estaciones y para llevar a efecto las disposiciones de esta Ley . . . ;

"(g) estudiará nuevos usos del radio, proveerá para usos experimentales de frecuencias, y en general estimulará el uso mayor y más efectivo del radio en beneficio del interés público;

" * * * * * *

"(i) tendrá autoridad para hacer reglamentos aplicables a estaciones de radio dedicadas a transmisiones en cadena;

" * * * * * *

"(r) dictará reglas y reglamentos, y prescribirá restricciones y condiciones no inconsistentes con la ley, que puedan ser necesarias para llevar a cabo las disposiciones de esta Ley . . . "

Si yuxtaponemos las normas contenidas en el estatuto federal a que hacemos referencia y las que nuestra legislatura impuso en la Ley núm. 8 de 1941, fácilmente se verá que las de la *Federal Communications Act* son mucho más amplias. No obstante su amplitud, en el reciente caso de *National Broadcasting Co. et al.* v. *United States et al.*, resuelto por la Corte Suprema de los Estados Unidos el 10 de mayo último (——U. S. ——, —— L. ed. ——), dicha Corte, por voz de su Juez Sr. Frankfurter, declaró dichas normas suficientes a los efectos de la delegación de poder, al expresarse en los siguientes términos:

"El criterio que rige el ejercicio del poder de la Comisión para expedir licencias es 'el interés público, la conveniencia o la necesidad.' Secciones 307 (*a*) (*d*), 309 (*a*), 310, 312."

Y más adelante se dice:

"La Comisión, sin embargo, no fué dejada sin restricciones en la ejecución de este deber. La piedra de toque provista por el Congreso fué 'el interés público, la conveniencia o la necesidad', norma tan concreta como lo puedan permitir los complicados factores para dictaminar en ese campo de autoridad delegada."

Véase al mismo efecto *Federal Radio Com.* v. *Nelson Bros. B. & M. Co.*, 289 U. S. 266, 77 L. ed. 1166.

En el caso de *McGrew* v. *Industrial Commission* (Utah, 1938) 85 P. (2d) 608, la norma establecida por la Legislatura en relación con una ley de horas y salarios para mujeres y menores, empleados en negocios al *detall,* era que los salarios pagados en la industria *no fuesen inadecuados para suplir el coste de una vida apropiada o que las horas de trabajo no fueran perjudiciales a la salud, a la moral o al bienestar* de los trabajadores. Como en el caso de autos, en el de Utah se atacó la constitucionalidad de la ley, alegándose que constituía una inconstitucional delegación de poder legislativo.

Al sostener la suficiencia de la norma establecida por la legislatura, se dice en la opinión concurrente del Juez Wolfe:

"Convengo también en que el caso no presenta tal delegación de poderes legislativos que produzca la inconstitucionalidad de la ley. Se provee una norma o guía. El salario debe ser 'no menos que el adecuado para suplir el coste necesario de una vida apropiada para mujeres y menores.' Esto debe interpretarse como que significa aquel salario que provee el necesario coste de una vida apropiada. *La norma no tiene que ser matemática o exacta,* o una de la cual se pueda llegar a una sola conclusión. La norma aquí establecida es difícilmente menos definida que el caso en donde el Presidente es requerido a determinar si consideraba qué contribuciones u otras concesiones impuestas por otros gobiernos a los productores de los Estados Unidos eran recíprocamente desiguales o irrazonables; . . . o a la autoridad conferida al Secretario del Tesoro para 'a virtud de recomendaciones de una junta de expertos, *determinar la norma uniforme de pureza, calidad y adecuación* para consumo de todas clases de té importadas en los Estados Unidos' (*Buttfield* v. *Stranahan,* 192 U.S. 470, 24 S. Ct. 349, 48 L. ed. 525) . . . ''

Cf. *In re Van Hyning* (Mich. 1932) 241 N. W. 207, 208.

Considerada la naturaleza y propósito de la legislación insular envuelta, no puede sostenerse seriamente que las normas impuestas por nuestra legislatura sean tan vagas e imprecisas que constituyan una inconstitucional delegación de poderes.

Resuelta la anterior cuestión, procederemos ahora a considerar la siguiente:

3. *Si los efectos de la sección 10–A, adicionada a la Ley núm. 8 de 1941 por la núm. 44 de 1942, que empezó a regir el 23 de julio de ese año, se aplican a una huelga que tuvo efecto y terminó antes de la aprobación de dicha sección.*

Esta impugnación va dirigida a anular el decreto número 2 que como hemos dicho fué aprobado con efecto retroactivo al 16 de febrero de 1942, fecha en que según la junta terminó la huelga a que se refiere la proclama del Gobernador de que antes hemos hecho mérito.

Como dijéramos al principio de esta opinión, el 29 de julio de 1942 el Gobernador promulgó la proclama antes mencionada, basándose en la existencia de una huelga que se alega tuvo lugar en la industria del azúcar y que según la propia junta terminó el 16 de febrero de 1942. Veamos ahora si del contexto de la sección 10-A surge la intención legislativa de que dicho precepto sea aplicable a una situación de hechos que terminó completamente el 16 de febrero de 1942. La sección 1 de la Ley núm. 44 de 23 de abril de 1942 antes mencionada, consiste de una exposición de motivos que conviene tener presente a los efectos de interpretar la indicada sección 10-A. Dicha sección 1 dice así:

"Sección 1.—*Exposición de Motivos*.—Sin perjuicio del sagrado derecho de huelga que asiste a los obreros para mejorar sus condiciones de vida y de trabajo, es conveniente y necesario asegurar la subsistencia de las actividades industriales en Puerto Rico y evitar que los obreros dejen su trabajo cuando entre ellos y sus patronos surjan controversias por salarios que puedan ser solucionadas mediante la pronta fijación de salarios razonables. A tal efecto, es deber del Estado determinar procedimientos que, garantizando a los obreros su derecho a reclamar mejor compensación, permitan a éstos seguir derivando los medios indispensables para cubrir sus necesidades y permitan a la industria seguir utilizando los servicios de tales obreros en tanto se ventilan sus reclamaciones. En tiempos de emergencia, cuando es más necesaria aun la ininterrumpida actividad de todas las industrias, se hace más aconsejable el establecimiento de procedimientos especiales para la pronta fijación de salarios que, aplicándose en algunos casos con efecto retroactivo, eviten así la paralización de la industria o privación temporal para los obreros de sus medios de vida."

Y la sección 10-A en lo pertinente dice:

"No obstante lo dispuesto en otras secciones de esta Ley, el Gobernador de Puerto Rico, mediante proclama al efecto, podrá requerir en cualquier momento de la Junta de Salario Mínimo que nombre un Comité de Salario Mínimo para investigar las condiciones de trabajo que prevalecen en determinada ocupación, negocio o industria en que exista o haya existido dentro de los seis (6) meses anteriores a la fecha de la proclama del Gobernador, un estado de huelga, paro

patronal, emergencia o controversia entre obreros y patronos sobre salarios, y fije los salarios mínimos que deberán pagarse en la ocupación, negocio o industria en cuestión.

"El Gobernador, al emitir la proclama que se provee en esta sección, hará constar que los salarios que la Junta fijare tendrán efecto retroactivo a la fecha en que los trabajadores se hayan reintegrado o se reintegraren al trabajo."

Es un principio universal de Derecho, consagrado en el artículo 3 del Código Civil, que las leyes civiles de carácter sustantivo no tendrán efecto retroactivo si no dispusieren expresamente lo contrario, y aun así, en ningún caso perjudicarán derechos adquiridos al amparo de una legislación anterior.

Si examinamos la sección 10-A que nos ocupa, inmediatamente veremos que ni expresa ni siquiera implícitamente dispone que debe dársele efecto retroactivo. Por el contrario, la parte pertinente de la exposición de motivos, así como el propósito de la ley misma, claramente demuestran que no fué ésa la intención del legislador. El evidente propósito de la ley, conforme surge de la exposición de motivos, es evitar que mientras se ventilan sus reclamaciones, tengan los obreros que abandonar su trabajo, de ese modo privándose de los medios indispensables para cubrir sus necesidades, a la vez que paralizan la industria privándola de su trabajo. Siendo ése el propósito de la ley, fácilmente se comprende que sus preceptos no pueden ser de aplicación a una situación que no es necesario evitar, ni se puede evitar, porque dejó de existir mucho antes que la propia ley existiera. Pero asumiendo que hubiese sido el propósito del legislador darle a la sección 10-A efecto retroactivo, aun así tendríamos que resolver que en tanto en cuanto dicha sección fuese aplicable a contratos de servicios celebrados y consumados, como en este caso, antes de su vigencia, la misma sería anticonstitucional, ya que privaría a los patronos de su propiedad sin el debido procedimiento de ley. La razón es obvia; es la misma que se adujo por el Tribunal Supremo de los Estados

Unidos al declarar anticonstitucional una ley que pretendía imponer contribuciones sobre donaciones efectuadas antes de su vigencia. Véase *Welch v. Henry,* 305 U.S. 134, 147, citado extensamente en *Ballester v. Tribunal de Apelación de Contribuciones, etc.,* 61 D.P.R. 474. Los contratos de servicios celebrados entre patronos y obreros con arreglo a un convenio colectivo fueron consumados seis meses antes de entrar en vigor el estatuto que ahora consideramos. Era imposible para los patronos determinar con anterioridad los salarios que fijaría posteriormente la Junta de Salario Mínimo. Sería injusto y arbitrario, por tanto, obligarles a pagar un jornal que de haberlo conocido de antemano, hubieran podido optar por no contratar los servicios de los obreros, y en el caso de que la necesidad de su negocio les obligase a ello, habrían tenido entonces la oportunidad de adoptar otras medidas en virtud de las cuales pudiesen compensar el aumento de los salarios. Esos contratos completos y terminados, *facta praeterita* como decían los romanos, no pueden ser alterados por leyes o decretos posteriores sin ofender los más elementales principios de justicia.

Surge a primera vista la diferencia entre el caso de autos y aquellos en que se ha sostenido la validez de leyes que imponen o aumentan el tipo de contribuciones sobre ingresos, con efecto retroactivo, porque según dijimos en el caso de *Ballester,* supra, no podemos asumir que un contribuyente rechace ingresos netos aunque sepa que posteriormente dichos ingresos habrán de ser sujetos a una nueva contribución o al aumento de la vigente a la fecha de recibirlos.

Por lo expuesto, fuerza es concluir que independientemente de la cuestión que discutiremos más adelante, el decreto núm. 2 es nulo por falta de jurisdicción en la Junta para aprobarlo.

4. *Sostiene la recurrente que en el curso de la audiencia ante la Junta se admitió por sobre su objección y excepción, evidencia improcedente e impertinente en violación a la garantía constitucional del debido procedimiento de ley.*

Conforme resulta de la evidencia, al iniciar el comité de salario mínimo la investigación a que se contrae la sección 6 de la ley, la junta le entregó un estudio sobre la industria azucarera en Puerto Rico, preparado por varios expertos en la materia. Luego el comité, al rendir su informe a la junta, acompañó todas las declaraciones y otra evidencia *ex parte* que había recibido durante su investigación. Más tarde, al celebrar la junta la audiencia prescrita por la sección 8, con la oposición de los recurrentes recibió en evidencia el estudio sobre la industria azucarera antes mencionado, así como la prueba y declaraciones ex parte tomadas por el comité al practicar la investigación. Alegan los recurrentes que la junta infringió la sección 6 de la ley al entregar y poner a disposición del comité el estudio antes mencionado; y que también constituyó error por parte de la junta recibir en evidencia la prueba y declaraciones ex parte presentadas ante el comité sin dar a la recurrente una oportunidad de repreguntar a los testigos, no obstante haberlo solicitado en tiempo.

Es deber del comité investigar las condiciones de trabajo que prevalecen en la industria del azúcar, y como resultado de esa investigación rendir a la junta un informe con recomendaciones relativas al salario mínimo indispensable para satisfacer las necesidades normales de los trabajadores, así como sobre el número de horas de labor compatibles con la salud, seguridad y bienestar de los mismos, y sobre las condiciones de trabajo requeridas para la conservación de la salud, etc. Siendo ello así, no vemos cómo, a falta de una disposición legal que lo prohiba, haya de impedirse a la junta que facilite al comité dicho estudio, cooperando así con éste para que pueda llevar a efecto su propósito. El hecho de que la junta someta al comité cualquier trabajo de la naturaleza indicada, no implica que el comité tenga necesariamente que aceptar las conclusiones del trabajo que se le someta, si a su juicio no son correctas.

La sección 6 expresamente prescribe que "los procedimientos y deliberaciones de los comités de salario mínimo

serán por escrito, para el uso de la junta y *serán admisibles en evidencia en cualquier procedimiento ante la Junta.''* (Bastardillas nuestras.)

La ley no prescribe que el comité deba celebrar audiencias. Simplemente le ordena que practique una investigación, y para llevarla a efecto, es lógico que reciba testimonios de personas que puedan darle luz sobre el objeto de la investigación. Por consiguiente, esas declaraciones juradas que tomó el comité, lo mismo que el estudio que le facilitara la junta, todo lo cual fué utilizado en la preparación del informe que rindió en cumplimiento de la ley, evidentemente forman parte de sus procedimientos y deliberaciones, y si la legislatura tuvo a bien prescribir la regla de evidencia de que tales procedimientos y deliberaciones fuesen admisibles como prueba en cualquier procedimiento ante la junta, actuó ésta correctamente al admitirlos. No era indispensable, salvo en caso de fraude o error, que como condición precedente a su admisión la junta citase a las distintas personas que prestaron dichas declaraciones para ser repreguntadas por cualquier parte interesada en el procedimiento ante la junta, como no es indispensable para la admisión en evidencia de un documento público, salvo en las circunstancias antedichas, traer al tribunal el funcionario que lo redactó a fin de ser repreguntado por cualquier parte interesada en dicho documento. La ley, como hemos visto, sólo prescribe que dichas deliberaciones y procedimientos son admisibles en evidencia, pero el peso o credibilidad que pueda merecer el documento descansa en la sana discreción de la junta. Si bien las partes interesadas, como hemos dicho, no pueden exigir que como condición precedente a la admisión de los procedimientos y deliberaciones del comité se sometan a contrainterrogatorio las personas que declararon ante dicho organismo, es obvio que una vez admitidos, dichas personas interesadas pueden presentar toda la evidencia que sea pertinente para controvertirlos, incluyendo el testimonio de aquellas personas que declararon ante el comité a favor o en contra de dichas per-

sonas interesadas. Siendo ello así, habiendo los recurrentes solicitado que ciertos testigos que declararon ante el comité fuesen citados para ser examinados por ellos ante la junta, hubiera sido error de ésta el negarse a citarlos una vez demostrado que dichos testimonios eran materiales a la controversia y que por la forma en que aparecían expuestos en el informe, indebidamente resultaban perjudiciales a los intereses sustanciales de los recurrentes. No apareciendo del récord que ese error por parte de la junta hubiera perjudicado los derechos sustanciales de los recurrentes, puesto que no se demostró la materialidad de dicha prueba, tenemos que resolver que el indicado error no produce por sí solo la revocación de la resolución recurrida.

_5. *Sostienen los recurrentes que la Junta de Salario Mínimo, en la forma en que está constituída por ley, priva a las partes interesadas de una vista justa e imparcial en violación de la Sección 2 de la Ley Orgánica de Puerto Rico.*

Esta proposición de los recurrentes está predicada en lo dispuesto en la sección 2 de la Ley, de conformidad con la cual la junta se compondrá de cuatro representantes de la clase patronal, cuatro representantes de la clase obrera y un representante de los intereses públicos, que será su presidente. Se arguye que los miembros así designados necesariamente son personas interesadas en defender la clase que representan y por consiguiente no pueden actuar como una junta justa e imparcial.

A primera vista el calificativo de "representantes" de la clase obrera y de la patronal dan la impresión de que la misión de los miembros así designados es procurar dentro de la junta el mejor partido para la clase por ellos representada. Pero no es así. Ellos vienen a resolver las cuestiones ante la junta de acuerdo con la prueba que se presente ante ella y ninguna resolución de la junta será válida a menos que la misma esté basada en prueba sustancial. La mejor prueba de que tales miembros no vienen predispuestos contra la clase

no representada por ellos, es la circunstancia que ocurre en este caso, donde el decreto número 3 fué aprobado con el voto unánime de sus nueve miembros.(⁶) Si se nombra igual número de miembros de una y otra clase es porque, por pertenecer a ellas, se hallan familiarizados con sus respectivos problemas y con las condiciones de vida y necesidades de los obreros.

Ni en la búsqueda que hemos hecho ni en los alegatos de las partes hemos encontrado decisión alguna que sostenga que la constitución de una junta administrativa en la forma dispuesta por la ley insular sea inconstitucional. Por el contrario, tanto en el gobierno federal como en el de varios estados existen disposiciones relativas a constitución de juntas administrativas análogas a la creada por la Ley núm. 8 de 1941.

6. *Se alega en otros recursos y podría alegarse en éste que los decretos números 2 y 3, y la propia Ley núm. 8 de 1941, son nulos a virtud de las disposiciones del estatuto federal denominado "Federal Inflation Control Act", aprobado el 2 de octubre de 1942 (50 U.S.C.A. App. 961).*

En apoyo de su tesis alegan dichos recurrentes que ciertas órdenes de la Junta Nacional de Trabajo de Guerra a que nos referiremos inmediatamente, son nulas por falta de jurisdicción para dictarlas. Se trata de las órdenes numeradas 7 y 8, dictadas el 3 de noviembre de 1942, que dicen así:

"Orden General Núm. 7.—Toda vez que el Título VI, Sección I, de la Orden Ejecutiva núm. 9250, fechada el 3 de octubre de 1942, prescribe que 'Nada de lo contenido en esta orden se entenderá que afecta el actual funcionamiento de la Ley de Normas Razonables de Trabajo', y puesto que los estatutos y órdenes de las autoridades debidamente constituídas de los distintos estados que fijan salarios mínimos para ciertas clases de trabajos cumplen los verdaderos propósitos e intención de la Ley de Normas Razonables de Trabajo y tienen por objeto la eliminación de las normas bajas de vida dentro

(⁶) Dicho decreto no fué firmado por el miembro de la junta, Sr. Serrallés, quien estuvo conforme, por la circunstancia de haber tenido que ausentarse precipitadamente para los Estados Unidos antes de firmarse el decreto.

del significado de la Sección 2 del Título II de la Orden Ejecutiva núm. 9250 de la Junta Nacional de Trabajo de Guerra, por la presente se aprueban los aumentos en salarios hechos en cumplimiento de tales estatutos y órdenes.''

''Orden General núm. 8.—En uso de la autoridad conferida a la Junta Nacional de Trabajo de Guerra por la Sección 4001.14 del Parte 4001, titulado 'Regulations relating to wages and salaries' expedido en 27 de octubre de 1942 por el Director de Estabilización Económica, aprobado por el Presidente, y estimándolo necesario para la efectiva administración de la Ley del Congreso de 22 de octubre de 1942, la Junta por la presente determina que el ajuste en jornales y salarios sobre los cuales esta Junta tiene jurisdicción y que son pagados en cualquier territorio o posesión de los Estados Unidos, excepto Alaska, quedan exentos de los efectos de dichos reglamentos y en lo sucesivo podrán hacerse sin la aprobación de la Junta.''

La Orden General núm. 8 es de tan manifiesta aplicación a Puerto Rico que no es necesario resolver si también lo es la número 7 antes transcrita. Por lo tanto la única cuestión que nos resta determinar es si dicha Orden General número 8 ha sido legalmente dictada.

En el alegato radicado por los Estados Unidos de América como *amicus curiae,* suscrito por el Fiscal de la Corte de Distrito de los Estados Unidos para Puerto Rico, se hace un minucioso estudio de la legislación federal de la cual derivan su validez las órdenes generales 7 y 8, y de dicho alegato hemos hecho el siguiente extracto:

La Junta Nacional de Trabajo de Guerra fué creada por el Presidente a virtud de Orden Ejecutiva núm. 9017. Esa Orden Ejecutiva que creó dicha junta dentro de la agencia denominada *Office for Emergency Management,* prescribe la forma en que la misma quedará constituída y establece el procedimiento a seguir para ajustar y arreglar disputas obreras. En la fecha en que se creó, el único fin de la Junta Nacional de Trabajo de Guerra era arreglar las disputas por medios pacíficos para que no pudiera haber huelgas o paros patronales mientras durase la guerra. Se concedieron a la junta facultades para promulgar reglas y reglamentos apropiados para la ejecución de sus deberes.

La Junta Nacional de Guerra obtuvo reconocimiento oficial del Congreso, al aprobarse en 30 de enero de 1942 el estatuto denominado *Emergency Price Control Act,* el cual fué enmendado por el titulado *Inflation Control Act,* aprobado el 2 de octubre de 1942. Este estatuto, dirigido primordialmente a la estabilización de salarios, persigue el propósito de complementar las disposiciones sobre estabilización de precios del *Price Control Act,* y de ese modo crear un modelo uniforme para toda la nación, dirigido a impedir el alza de precios y salarios que sería secuela lógica del aumento en el poder adquisitivo y de la reducción de las existencias como resultado de la guerra.

Fué el estatuto denominado *Inflation Control Act* el que ordenó y autorizó al Presidente a expedir órdenes generales para estabilizar precios, jornales y salarios, debiendo hacerse la estabilización hasta donde fuera posible sobre la base de los niveles existentes el 15 de septiembre de 1942. Fué autorizado el Presidente a hacer ajustes hasta donde fuere necesario, para ayudar en la efectiva prosecución de la guerra, y para corregir manifiestas injusticias. A ese fin puede el Presidente promulgar reglamentos y hacer uso de los poderes que le confiere la ley, a través del departamento, agencia o funcionario que estime conveniente. Haciendo uso de los poderes conferídosle por dicho estatuto, el Presidente creó la agencia denominada *Office of Economic Stabilization,* bajo la dirección de un director de estabilización económica, a quien facultó para formular y desarrollar una política nacional relativa a precios, jornales y salarios, etc., a fin de evitar el aumento en el coste de la vida y disminuir la emigración de la clase trabajadora y facilitar la prosecución de la guerra. Por último, en 27 de octubre de 1942, el Director de Estabilización Económica, haciendo uso de los poderes así conferídosle, expidió una orden a la Junta Nacional de Trabajo de Guerra para determinar, entre otras cosas, si un pago de salarios es hecho en contravención del *Inflation Control Act*

o de cualesquiera órdenes o reglamentos promulgados bajo la autoridad de esa ley. El párrafo 4001.14 de la orden en cuestión dice así:

"*Territorios y posesiones.*—La Junta y el Comisionado tendrán autoridad para eximir de los efectos de los reglamentos, cualesquiera jornales y salarios pagados en cualquier territorio o posesión de los Estados Unidos donde fuere necesario para la efectiva administración de la ley y de los reglamentos sobre esta materia."

Esta orden del Director de Estabilización Económica tiene la fuerza de una orden ejecutiva del Presidente, fué expresamente aprobada y firmada por el Presidente, y sustituye disposiciones contradictorias de la Orden Ejecutiva núm. 9250.

Por lo expuesto, se comprende fácilmente que la Junta Nacional de Trabajo de Guerra fué legalmente autorizada para expedir las órdenes generales números 7 y 8 antes transcritas y especialmente la número 8, entre la cual y nuestra Ley núm. 8 de 1941 no existe conflicto alguno.

7. *Sostiene la recurrente que fué privada de su derecho a una vista imparcial y justa en violación de la cláusula constitucional que garantiza el debido procedimiento de ley.*

Conforme resulta del récord y lo admite la representación legal de la junta, desde el 25 de noviembre de 1942 en que empezó la audiencia ante ella, de los nueve miembros que componen la junta sólo uno, el presidente, estuvo presente en todas las sesiones de dicha audiencia. Dos de ellos, los Sres. Colón Gordiany y Fiz Jiménez, sólo asistieron a la primera sesión, y sin que aparentemente conocieran la prueba aducida y sin haber oído los argumentos orales presentados por las partes, participaron en la resolución por la cual expidió la junta los decretos números 2 y 3, motivos de este recurso. Protestaron los recurrentes repetidas veces e hicieron constar en el récord las ausencias de los distintos miembros, y luego, en la moción de reconsideración que presentaron ante la junta y que fué denegada como hemos dicho

antes, impugnaron expresamente la capacidad de esos dos miembros por el indicado fundamento de no haber oído la prueba ni los argumentos orales. Manifestaron ellos que se habían enterado de la prueba por el récord. Pidieron entonces los recurrentes que se les permitiese presentar el testimonio de los taquígrafos que tomaron la evidencia aducida, a fin de impugnar las manifestaciones de los dos miembros en cuestión, asegurando los recurrentes que aun en los momentos en que tal evidencia ofrecían, las notas taquigráficas no habían sido todavía transcritas. La junta no permitió la presentación de esa prueba. A la inequívoca aseveración de los recurrentes en el indicado sentido, responde la junta en su alegato principal, páginas 79–80, en los siguientes términos:

"Será suficiente que los miembros de la Junta conozcan por el récord, que el taquígrafo puede transcribirles o leerles, toda la evidencia o aquella parte que no oyeron personalmente, como en muchas ocasiones el juez acude al récord para refrescar su memoria y aclarar algo que le parece no haber oído o no recordar bien. La aseveración de algunos recurrentes de que la transcripción del récord no estaba terminada para la fecha en que dictaron los decretos, sin indicar qué parte faltaba, y cuando ya habían transcurrido dos meses desde la conclusión de la audiencia hasta la aprobación de los decretos, tiempo durante el cual los dos taquígrafos, además de transcribir, estaban a la disposición de la Junta o de sus miembros, no quiere decir que éstos no los llamaran para que les dieran lectura a sus notas taquigráficas en cuanto fuera necesario, como suelen hacerlo los jueces en circunstancias análogas. La evidencia que alrededor de la cuestión se quería ofrecer en la vista celebrada por la Junta para oír a los peticionarios argumentar sus mociones de reconsideración no era suficiente ni procedía admitirse porque se notificó que dicha vista, *que no es requerida por ley,* se convocó al solo objeto de oír los informes orales de aquellos que quisieran comparecer. Si se hubiera abierto el caso a prueba sobre ese extremo, de igual modo hubiera tenido que recibirse evidencia sobre todas las cuestiones de hecho levantadas en las mociones de reconsideración, repitiéndose así la audiencia ya celebrada. Además, la vista no se anunció en la prensa del país para conocimiento de otras partes con posible interés en la cuestión y del público, sino que la notificación se limitó a las personas y entidades

que habían presentado mociones de reconsideración. Hubiese violado la Junta, en ese caso, el 'debido procedimiento' que tanto invocan los recurrentes. Si iba a presentarse evidencia, que no se anunció en ningún momento, había que seguir el procedimiento adecuado.''

Veamos ahora qué prescribe la ley respecto al procedimiento que deberá seguir la junta a partir del momento en que el comité de salario mínimo rinde su informe:

''Artículo 8.—Con vista del informe rendido por el Comité de Salario Mínimo, y *previa audiencia pública de las partes interesadas y del público*, la junta tendrá autoridad para fijar:

''(1) El tipo mínimo de salario que deberá pagarse a los trabajadores empleados en la ocupación, negocio o industria en cuestión, o en la operación, rama, proceso o actividad de la ocupación, negocio o industria de que se trate.

'' * * * * * * *

''(2) El máximo de horas de labor consistente con la salud, la seguridad y el bienestar general de los trabajadores en dicha ocupación, negocio o industria; . . .

'' * * * * * * *

''(3) Las condiciones de trabajo requeridas para la conservación de la salud, la seguridad y el bienestar de los trabajadores en dicha ocupación, negocio o industria.

''Sección 9.—Tan pronto como la junta fijare el día y sitio para la celebración de una audiencia pública con el objeto de considerar y determinar lo que se expresa en la sección anterior, procederá a anunciar dicha audiencia mediante avisos que se publicarán por lo menos en un periódico de general circulación en la Isla con no menos de diez (10) días de anticipación.

''Sección 10.—Después de celebrada dicha audiencia, la junta deberá dictar un decreto mandatorio . . . ''

La audiencia pública, no hay duda, es un requisito jurisdiccional que la junta debe cumplir a cabalidad para poder dictar un decreto mandatorio válido. Esa audiencia no debe ser una mera farsa donde, despreciando la sustancia, sólo se trate de llenar la forma. No es requisito indispensable que todos los miembros de la junta estén presentes mientras se recibe la evidencia. Pero sí es necesario que al deliberar y dictar la resolución, todos los que participen en la resolución

conozcan la evidencia, así como los argumentos de las partes, pues de otro modo no puede decirse que ha existido la previa audiencia pública que exige la ley. A la junta toda le constaba que los dos miembros impugnados sólo habían asistido a la primera sesión de la audiencia pública, y que dicha audiencia se prolongó por varios días, siendo la evidencia aducida tan extensa que consta de cuatro grandes volúmenes, con un total de 1471 páginas.

No hay duda que tanto los dos miembros en cuestión como los demás que no asistieron regularmente a las sesiones, estaban incapacitados para participar en las deliberaciones y resolución de la junta a menos que se demostrase que unos y otros, por lo menos, habían leído las notas taquigráficas y se habían enterado de los argumentos orales. Si contrario a lo que se proponían probar los recurrentes, el récord había sido transcrito con anterioridad a la vista de la moción de reconsideración y todos los miembros tuvieron una razonable oportunidad de leerlo, y si en realidad lo leyeron, fácil y rápidamente se hubiese resuelto la controversia oyendo el testimonio de los taquígrafos y el de los miembros impugnados, si es que los primeros declaraban haber tenido el récord con razonable anticipación a la fecha en que se dictó la resolución de la junta. Y si esa evidencia demostraba que era cierta la aseveración de los recurrentes, ¿a qué adoptar la conocida táctica del avestruz, pretendiendo engañarse a sí mismos, cerrando la puerta a una evidencia de cuyo resultado podría depender la validez de los decretos dictados?

Dice Robert M. Benjamin en su reciente obra ''Administrative Adjudication in the State of New York'', página 10, que las juntas o tribunales administrativos no sólo deben hacer justicia si que actuar de tal forma que el interesado pueda darse cuenta de que la justicia se ha hecho. A lograr ese fin tanto contribuye el procedimiento seguido como el resultado de la decisión misma.

El caso de · *Morgan* v. *United States*, 298 U. S. 468, 80 L. ed. 1288, citado por la recurrente, es de perfecta aplicación a la situación del presente caso. En aquél el Secretario de Agricultura dictó una orden fijando las tarifas máximas que podían cobrarse por las agencias del mercado para la compra y venta de ganado en "Kansas City Stock Yards". De conformidad con la sección 310 del *Packers and Stockyards Act,* el Secretario puede, a iniciativa propia o a virtud de querella, practicar una investigación. Si como resultado de ésta llega a la conclusión de que cualquier tarifa, cargo, reglamento o práctica de un propietario de un corral de ganado o de una agencia de mercado en relación con dichos negocios, es o puede resultar injusto, irrazonable o discriminatorio, podrá el Secretario, repetimos, determinar y prescribir la tarifa, cargo o cargos que en lo sucesivo tendrán derecho a cobrar. Igualmente tendrá la facultad de fijar el máximo o mínimo, o máximo y mínimo, que pueda cobrarse, y prescribir las reglas o práctica que sean justas, razonables e indiscriminatorias.

Haciendo uso de la autoridad conferídale en dicha sección, se instituyó un procedimiento por orden del Secretario de Agricultura disponiendo que se investigara la razonabilidad de las tarifas existentes. Se recibió testimonio y posteriormente se dictó una orden fijando tarifas. Se solicitó la reconsideración de dicha orden y fué reconsiderada teniendo en cuenta el cambio que había tenido lugar en la situación económica. Después de recibir una voluminosa evidencia, la orden final fué dictada en 14 de junio de 1933, negándose el Secretario a reconsiderar dicha orden el 6 de julio del mismo año.

· Morgan no estuvo conforme con la tarifa decretada ni con el procedimiento seguido por el Secretario de Agricultura y recurrió ante una corte federal de distrito instando un pleito para impedir que el Secretario de Agricultura pusiese en vigor la referida tarifa. En la demanda alegó Morgan que el Secretario de Agricultura había dictado la

orden decretando la tarifa sin haber oído o leído la evidencìa y sin haber oído o considerado los argumentos orales, o sin haber leído o considerado los alegatos sometidos por los ahora demandantes. Se alegaba que la única información que el Secretario tenía acerca del procedimiento seguido la había obtenido a virtud de consulta con empleados de su departamento. El Gobierno solicitó la eliminación de esa alegación de la demanda y la corte la decretó. Apeló el demandante para ante la Corte Suprema de los Estados Unidos y dicho Tribunal revocó la sentencia de la corte de distrito que había sostenido la validez de la orden del Secretario de Agricultura, por constituir error perjudicial el no haber permitido al demandante alegar y probar lo expuesto en la materia eliminada.

Refiriéndose al procedimiento prescrito por la ley para que el Secretario pudiese hacer uso de la facultad concedídale por la indicada sección 310, dijo el Tribunal Supremo:

"El procedimiento no es uno de rutina administrativa regido por las normas aplicables a deberes de carácter puramente ejecutivo. Es un procedimiento que participa de la índole de la acción legislativa en la fijación de tarifas para agencias de mercado. Aunque la orden es legislativa y da al procedimiento su carácter distintivo (citas), es un procedimiento que a virtud de la autoridad conferida, tiene especiales atributo:. El Secretario, como agente del Congreso, al dictar las tarifas debe hacerlo ajustándose a las normas y de acuerdo con las limitaciones que el Congreso le ha impuesto. El Congreso ha exigido que el Secretario, como condición precedente para poder actuar en el sentido indicado, determine previamente que las tarifas existentes son o pueden resultar injustas, irrazonables o discriminatorias. Una vez así declarado por el Secretario, podrá él. determinar y prescribir cuál deberá ser la tarifa justa y razonable o la tarifa máxima o mínima que en adelante podrá cobrarse. Ese deber es completamente diferente de la acción ejecutiva ordinaria. Es un deber que conlleva el cumplimiento de requisitos fundamentales de procedimiento. Debe haber habido una amplia audiencia. Debe haber existido evidencia adecuada para sostener las conclusiones de hecho que fueran necesarias y pertinentes. Nada podrá considerarse como evidencia a menos que se haya presentado como tal. (Citas.)

Hechos y circunstancias que deban ser considerados no deberán ser excluídos. Tampoco deben considerarse hechos y circunstancias que no puedan surtir algún efecto legal en la conclusión. Las conclusiones de hecho basadas en la evidencia deberán abarcar los hechos básicos necesarios para sostener la orden. `(Citas.)

"Un procedimiento de esta índole requiere que se reciba y aprecie evidencia, así como la determinación de hechos basada en la apreciación de la prueba, y al dictarse una orden sostenida por tales conclusiones de hecho, participa de la naturaleza de un procedimiento judicial. De ahí que frecuentemente se le describa como un procedimiento de carácter cuasijudicial. El requisito de la amplia audiencia obviamente se refiere a la tradición de procedimientos judiciales en los cuales la evidencia es recibida y apreciada por el juzgador de los hechos. La audiencia tiene por objeto proporcionar la garantía de que el que decide esté obligado en conciencia a considerar la evidencia, a guiarse por ella exclusivamente, y a llegar a sus conclusiones no influído por consideraciones extrañas a la evidencia, consideraciones que en otros campos pudieran haber tenido alguna influencia en la determinación de una acción puramente ejecutiva. La audiencia la constituye el oír la evidencia así como los argumentos. Si el que determina los hechos que sirven de fundamento a la orden no ha considerado la evidencia o el argumento, es obvio que la audiencia no ha existido."

Devuelto el caso a la corte inferior, se restableció en la demanda la alegación cuya eliminación había ordenado la corte en el caso anterior y se ordenó al Secretario que radicase su contestación, hecho lo cual se procedió a la celebración del juicio, en el que en adición a la evidencia presentada en el juicio anterior, se presentó la pertinente a la materia restablecida en la demanda. La corte inferior dictó sentencia en los méritos a favor del demandado, fundándose en que de acuerdo con la prueba la audiencia celebrada por el Secretario cumplía con los requisitos de ley. Apeló nuevamente Morgan para ante el Tribunal Supremo de los Estados Unidos (*Morgan* v. *United States*, 304 U.S. 1, 82 L. ed. 1129). La evidencia elevada al Tribunal Supremo a virtud de este segundo recurso demostró que la audiencia se había celebrado antes de que el secretario tomase posesión de su cargo, que éste leyó la evidencia según se exponía en el alegato del

apelante y que al firmar la orden lo hizo basado en las conclusiones de hecho preparadas por los funcionarios del Negociado de Industria Animal; que la orden representaba su reacción a las conclusiones de hecho preparadas en dicho Negociado. Resultó además de la prueba que el secretario leyó el extracto de la evidencia que se le hizo en el alegato de los apelantes y que conferenció con sus subordinados, quienes habían extractado y analizado la prueba. Después de exponer estos hechos, el tribunal se expresó así:

"Pero una amplia audiencia, una justa y pública audiencia, requiere más que eso. El derecho a una audiencia comprende no sólo el derecho de presentar evidencia si que también una razonable oportunidad de conocer y refutar los argumentos de la parte contraria. El derecho a presentar argumentos implica esa oportunidad; de otro modo, ese derecho puede resultar ilusorio. Los que son obligados a debatir con el Gobierno en un procedimiento cuasijudicial encaminado a controlar sus actividades, tienen derecho a que se les de una razonable oportunidad de conocer lo que se propone el Gobierno y a ser oídos sobre la materia antes de que se expida la orden final.

" * * * * * * *

"Además, la evidencia habiendo sido presentada, el Secretario pudo recibir las conclusiones de hecho (*findings*) propuestas por ambas partes, siempre que cada una de ellas fuese notificada de las conclusiones propuestas por la otra, oír argumentos en relación con las mismas y preparar entonces dicho funcionario sus propias conclusiones. Pero lo que no sería esencial para la adecuación de la audiencia si el propio secretario propusiese las conclusiones, no es una norma que deba ser aplicada en casos como el presente en que el Secretario acepta y hace suyas las conclusiones preparadas por aquellos funcionarios que actuaron activamente como fiscales en representación del Gobierno, después de discutir el Secretario con ellos *ex parte,* sin dar una razonable oportunidad al querellado dentro del procedimiento para conocer los puntos de vista de los representantes del Gobierno a fin de poder rebatirlos. Eso es más que una irregularidad en el procedimiento: eso constituye un defecto fatal.

"El mantener las normas apropiadas por parte de las agencias administrativas en la ejecución de sus funciones cuasijudiciales es de la mayor importancia y de ninguna manera menoscaba u obstaculiza el ejercicio de su apropiada autoridad. Por el contrario, re-

dunda en su beneficio. Como hemos dicho al principio, si estas agencias, que cada día van multiplicándose y cuya necesidad es reconocida en nuestra compleja sociedad, han de servir los fines para los cuales fueron creadas y dotadas de vastos poderes, deben ellas acreditarse actuando de acuerdo con las más preciadas tradiciones judiciales que encierran un verdadero sentido dè justicia.

"Como la audiencia fué fatalmente defectuosa, se anula la orden del Secretario sin que expresemos opinión alguna sobre los méritos del caso."

*Por los fundamentos expuestos, procede declarar con lugar el recurso de revisión en este caso interpuesto, anular los decretos números 2 y 3 dictados por la Junta de Salario Mínimo de Puerto Rico y devolver los procedimientos a dicha junta para que de conformidad con los principios expuestos en esta opinión, proceda, en relación con el decreto número 3, a seguir los procedimientos necesarios a fin de determinar si los miembros de la junta que en cualquier momento estuvieron ausentes de las sesiones leyeron las partes correspondientes del récord antes de dictarse dicho decreto, o en la alternativa, que lean dichas partes del récord, debiendo además concederse una nueva oportunidad a los recurrentes para que presenten informes escritos u orales para ser oídos o leídos por la junta en pleno, verificado lo cual procederá ésta a dictar el decreto que corresponda.*

El Juez Asociado Sr. Snyder, aunque no estuvo presente al firmarse esta opinión y la sentencià, intervino en las conferencias en que se discutió dicha opinión y concurre con la misma.