REXFORD G. TUGWELL, ET ALS., peticionarios, *v.* CORTE DE DISTRITO DE SAN JUAN, HON. MARCELINO ROMANY, JUEZ, demandada.

Núm. 20.—*Sometido:* Octubre 9, 1944. *Resuelto:* Diciembre 5, 1944.

*Hon. Procurador General Interino Jesús A. Gónzález, E. Campos del Toro, Miguel Guerra-Mondragón y Arcilio Alvarado,* abogados de los peticionarios; *F. Fernández Cuyar, Héctor González Blanes y Luis A. Archilla Laugier,* abogados del interventor, demandante en el pleito principal.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

El Fondo Insular de Emergencia es una asignación continua y permanente "del saldo en efectivo del fondo gene-

ral . . . que excedan de los saldos de las asignaciones consignadas en la Ley de Presupuesto . . ." al cerrarse las operaciones de cada año económico. Artículo 3, Ley núm. 33 de 1932.[1] En esta forma, constantemente reintegrado y aumentado el Fondo consistía allá para el 30 de junio de 1944 de $8,155,579.20. El artículo 4 de la Ley núm. 33 dispone que "El 'Fondo Insular de Emergencia' será aplicado a afrontar necesidades públicas inesperadas e imprevistas, causadas por calamidades, tales como guerras, huracanes, terremotos y plagas . . .". El artículo 7 dispone que "No se harán desembolsos del 'Fondo Insular de Emergencia' sino mediante resolución adoptada por el voto afirmativo de cuatro miembros de un comité constituído por cinco, como sigue: el Gobernador, el Presidente de la Cámara de Representantes, el Presidente del Senado, el Tesorero y el Auditor de Puerto Rico."

El 17 de mayo de 1944 el Comisionado del Interior solicitó de dicho comité una asignación de $100,000 "para hacer frente a las inesperadas necesidades públicas causadas por la continua sequía reinante en la Isla . . . a través del desarrollo de un programa de obras públicas . . .". El mismo día el Comisionado Interino de Agricultura y Comercio hizo una solicitud similar. Hizo constar que las cosechas de caña de azúcar, café y algodón habían sufrido considerable daño, y recalcó la seria situación en relación con los productos alimenticios como resultado de la sequía. En vista de ello solicitaba una asignación de $400,000 para aliviar el desempleo y para comprar semillas y abono para los agricultores más necesitados. El 22 de mayo se reunió el comité y por votación de 4 a 1 se dictó una resolución aprobando dichas peticiones y asignando las sumas solicitadas. El voto en contra fué dado por el Presidente de la Cámara.

---

[1] Leyes de Puerto Rico, 1932, según enmendada por la Ley núm. 3, Leyes de Puerto Rico, 1942, tercera sesión extraordinaria.

El 19 de junio Rodríguez Pacheco, en su capacidad de contribuyente y como Presidente de la Cámara,[2] radicó ante la corte de distrito una petición contra los restantes miembros del comité y contra otras personas solicitando una sentencia declaratoria al efecto de que la Ley núm. 33 era inconstitucional y nula, y que la resolución del 22 de mayo de dicho Comité no tenía validez legal.[3] El 28 de junio Rodríguez Pacheco, alegando que los fondos asignados para dicha resolución se estaban gastando rápidamente y pronto la asignación se agotaría, solicitó una orden de entredicho y un *injunction pendente lite*. Esta solicitud se enmendó el 29 de junio, y el mismo día se dictó una orden de entredicho y una orden para mostrar causa por las cuales no debía expedirse el injunction pendente lite. El 30 de junio los demandados solicitaron la desestimación, y el 24 de julio radicaron sus contestaciones a las peticiones de sentencia declaratoria y de injunction pendente lite. El 24 y el 31 de julio se celebró una vista en cuanto a la solicitud de injunction pendente lite en la que ambas partes presentaron prueba. La prueba demostró que de los fondos asignados por el comité a los Departamentos de Interior y de Agricultura quedaban sin gastar, respectivamente, $15,905.94 y $205,545.40.

El 25 de agosto el juez de distrito radicó una extensa y cuidadosa opinión resolviendo que la Ley núm. 33 era inválida y nulas las actuaciones realizadas de conformidad con la misma. Expedimos el auto de *certiorari,* bajo la Ley núm. 32 de 1943, para revisar la resolución de la corte de distrito

---

(2) Creemos innecesario considerar la contención de que Rodríguez Pacheco no tiene capacidad para obtener el remedio que aquí invoca como Presidente de la Cámara y como miembro del Comité (véase *Gobierno de la Capital* v. *Consejo Ejecutivo,* 63 D.P.R. 434), en vista de su derecho a demandar como contribuyente. *Buscaglia* v. *Corte,* resuelto el 28 de julio de 1944 (ante pág. 11), confirmado por la Corte de Circuito de Apelaciones el 24 de octubre de 1944. El juez que suscribe está solo al disentir de la opinión de la mayoría en cuanto a este punto, y por supuesto está obligado por la opinión de la corte en relación con el mismo.

(3) El 7 de julio se radicó una petición enmendada alegando contenciones adicionales.

de igual fecha concediendo un injunction preliminar prohibiendo desembolsos ulteriores de los fondos en controversia.

Los miembros del comité primeramente alegan que la corte inferior cometió error al considerar la validez de la Ley núm. 33 en esta etapa de los procedimientos. Su posición es que la corte de distrito debió haberse limitado, en una moción de injunction preliminar, a determinar si había envuelta una seria y sustancial cuestión. En apoyo de este argumento citan el caso de *Rivera* v. *Tugwell, Gobernador,* 59 D.P.R. 841; 60 D.P.R. 81. No nos es posible entender la teoría sobre la cual basa el comité este punto. Como revelará la discusión de este caso, no puede dudarse que en el mismo estén envueltas serias y sustanciales cuestiones de derecho. Si fuéramos a aplicar el caso de *Rivera* v. *Tugwell,* probablemente tendríamos sin ulterior discusión que sostener la acción de la corte de distrito al conceder un *injunction* preliminar.[4]

Pero no estamos preparados para decir, bajo todas las circunstancias de este caso, que la corte de distrito no estuvo justificada en hacer en este caso una determinación de constitucionalidad. Se radicó una contestación, se presentó prueba, y se sometió el caso por los alegatos. No hubo controversia sustancial en cuanto a los hechos. Y es difícil por tanto imaginarnos de qué manera podrían ayudar a la corte de distrito prueba y argumentos adicionales. Además, era una cuestión de grave interés público que las cuestiones suscitadas por este caso se decidieran prontamente. Quizás no hubiéramos criticado a la corte inferior si ésta no hubiera llegado a la determinación final, y hubiera dejado esa cuestión para después de la vista de la petición de injunction permanente. Pero aparentemente la corte de distrito creyó

---

[4] Esto es así si asumimos que el balance de conveniencias está a favor de Rodríguez Pacheco.

que no sería de ningún fin práctico la posposición de dicha determinación, y no podemos disentir de tal conclusión. El comité no nos ha demostrado que específicamente solicitó en la corte inferior tal medida restrictiva. Y como ya se ha indicado, de convenir con el comité, inevitablemente nos obligaría a sostener el injunction, ya que es obvio que está envuelta una seria y sustancial cuestión. Es más, el caso en que descansa el comité, *Rivera* v. *Tugwell,* resolvió que era necesario un injunction preliminar.

Después de todo, este caso se resolvió por una pura cuestión de derecho, que no puede ser cambiada por ninguna cantidad de prueba. La resolución expidiendo el injunction preliminar era apelable.[5] Y el caso ha sido traído ante nos bajo la Ley núm. 32 que se aprobó para facilitar la "rápida determinación de la cuestión que se presenta" y que nos confiere amplias facultades, hasta el extremo de dictar lo que en esencia es una sentencia final cuando se trata de revisar bajo ciertas circunstancias una mera orden de entredicho (*Buscaglia* v. *Corte,* supra). Sin establecer ninguna regla general que tienda a cubrir otros casos, concluimos por tanto que la corte inferior tenía derecho en este caso a emitir su opinión en cuanto a la validez de la Ley núm. 33 y a actuar de conformidad con la misma al resolver la moción de injunction *preliminar.*

 Pasemos a los méritos del caso. En este caso nos encontramos con que las partes están considerablemente de acuerdo. El comité admite que la corte de distrito estuvo correcta al resolver que era una violación de la separación de poderes y una invasión inconstitucional por la Legislatura de las funciones ejecutivas el disponer en el artículo 7 de la Ley núm. 33 que el Presidente de la Cámara y el Presidente del Senado serán miembros del Comité que deberá

---

[5] *Rivera* v. *Tugwell,* supra; *Fernández* v. *Buscaglia, Tesorero,* 60 D.P.R. 596.

aprobar todos los desembolsos del Fondo Insular de Emergencia. *Springer* v. *Philippine Islands,* 277 U. S. 189.[6]

Pero la próxima cuestión es un poco más difícil. ¿Están las cortes obligadas a anular en su totalidad la Ley núm. 33 debido a la admitida nulidad de aquella parte del artículo 7 que dispone la representación de la Legislatura en el comité? Aquí también las partes y la corte inferior están contestes en cuanto a la doctrina de derecho pertinente. La disputa surge, como suele casi siempre suceder, al tratarse de aplicar ·la doctrina a los hechos de este caso. La doctrina de derecho es ilusoriamente sencilla de exponer. Y como siempre los corrientes símbolos semánticos del derecho en los cuales siempre hay conformidad unánime al forjar la doctrina evocan violenta discrepancia cuando hay que decidir un caso específico mediante la aplicación de la fórmula. De cualquier modo, empezaremos exponiendo las reglas para determinar si un estatuto—que se admite es nulo en parte—es nulo en su totalidad o sólo es nulo parcialmente.

 ·La fórmula tiene dos fases: (1) La ley debe ser de hecho capaz de ser separada; y (2) la Legislatura tiene que haber tenido en mente que la ley sea separable. Stern, *Separability and Separability Clauses in the Supreme Court,* 51 Harv. L.

---

(6)Notamos de paso que la corte de distrito creyó que su conclusión estaba reforzada por la disposición del Artículo 30 de nuestra Carta Orgánica al efecto de que ''Ningún senador o representante . . . podrá ser nombrado para ningún cargo civil en el Gobierno de Puerto Rico durante el término de su ministerio'' (Título 48 U.S.C.A., sección 819). Indudablemente este argumento tiene considerable fuerza. La misma filosofía de gobierno que dió lugar a la amplia doctrina del caso de *Springer,* está expuesta específica y concretamente en la inhibición que el artículo 30 pone sobre los hombros de los miembros de la Legislatura. Si bien los casos citados y el razonamiento de la corte inferior parecen ser los correctos, la amplia doctrina del caso de *Springer,* por sí sola, es suficiente para impedirle a los Presidentes del Senado y de la Cámara que formen parte del comité. Como esto el comité lo admite, es innecesario dar una contestación definitiva en cuanto al artículo 30.

También añadimos que estamos de acuerdo con la resolución de la corte inferior, la cual no ataca Rodríguez Pacheco, de que el artículo 7 no representa una impropia delegación de poder legislativo. Como dice la corte de distrito, las normas fijadas por el estatuto son suficiente guía para la función ejecutiva de desembolso.

Rev. 76, expone la regla como sigue: " . . . la Corte Suprema, las cortes estatales y los comentaristas todos parece que están de acuerdo que la nulidad de una parte de un estatuto . . . no afectará el remanente (1) si las disposiciones válidas . . . son capaces de que se les dé efecto legal por sí solas, y (2) si la Legislatura hubiera tenido la intención de que existieran eliminándose las disposiciones inválidas". Véase *Dorchy* v. *Kansas,* 264 U. S. 286, 289–90.

El primer problema no merece seria consideración. El contribuyente no alega aquí, ni la corte de distrito lo resolvió, que la ley era enteramente inválida porque la desaparición de las frases nulas haría la ley impracticable. En verdad, los casos resuelven que es correcto extraer de una sección de un estatuto palabras sueltas o frases declaradas inválidas si con ello se puede dejar la sección y el remanente del estatuto en tal forma que se pueda poner en práctica.[7] El artículo 7 de la Ley núm. 33 fácilmente pasa este examen. Dicho artículo, eliminándosele la disposición nula, dice como sigue: "no se harán desembolsos del 'Fondo Insular de Emergencia' sino mediante resolución adoptada por . . . un comité constituído por . . . el Gobernador . . . el Tesorero y el Auditor de Puerto Rico."[8] Por tanto, procederemos a determinar si la Legislatura hubiera deseado que el estatuto, podado de esa manera, quadara en efecto.

Pero antes de entrar de lleno en el caso ante nos, debemos tener en cuenta ciertas consideraciones preliminares. Las partes y la corte inferior descansan en los mismos casos. Sin embargo, "la ley que ha surgido en cuanto a esta rama de interpretación estatutaria no es susceptible de un raciocinio preciso, a pesar de su frecuente uso y ramificación.

(7)*People ex rel. Alpha Portland Cement Co.* v. *Knapp* (N. Y., 1920) 129 N.E. 202, 7; *Berea College* v. *Kentucky,* 211 U.S. 45; *New York Central R. R.* v. *United States,* 212 U.S. 481; *El Paso & Northeastern R.* v. *Gutiérrez,* 215 U.S. 87; Stern, supra, pág. 110.

(8)Debe notarse, por los motivos que más adelante consignaremos, que hemos eliminado la disposición en cuanto a los cuatro votos en la teoría de que también cae con la disposición en cuanto a los miembros de la Legislatura.

Los casos de separabilidad están decididos a la luz de principios establecidos, pero cada decisión descansa principalmente sobre sus propios hechos específicos."[9]

También la franqueza nos obliga a reconocer que en tales casos " . . . lo que la intención Legislativa fué o pudo haber sido es a lo sumo . . . una conjetura judicial".[10] Pero a falta de una seguridad absoluta no estamos justificados en decir: La ley es parcialmente inválida; el permitir que subsista de una manera mutilada equivaldría a frustrar la voluntad de la Legislatura; por tanto la eliminamos en su totalidad. Las funciones de las cortes serían en verdad triviales si actuaran como meros autómatas para registrar resultados producidos de un modo tan mecánico. No podemos lavarnos las manos en cuanto al problema tan fácilmente y, mezclando la metáfora, tirarlo al regazo de la Legislatura. Toca a la Legislatura determinar en su próxima reunión si va a actuar a la luz de la nulidad parcial del estatuto. Mientras tanto, seríamos negligentes en el cumplimiento de nuestro deber si en el ínterin no hiciéramos un laborioso esfuerzo para determinar, bajo las circunstancias concurrentes, la intención legislativa mediante la más correcta conjetura posible.

Y al hacer este esfuerzo debemos tener en mente que "las palabras del Juez Cardozo, 'Todas las tendencias durante los años recientes, por lo menos en esta corte, ha sido aplicar el principio de segregación con liberalidad cada vez mayor' indudablemente exponen el punto de vista de la mayoría de las cortes."[11] Esta liberalidad se encuentra en la doctrina de que "no deben las cortes sacrificar las leyes en la creencia de que el legislar es un juego de capricho y fantasía . . . Nuestro derecho a destruir está restringido por

---

[9] Sutherland, *Statutory Construction* (3a. edición, Horack), pág. 198.

[10] Sutherland, supra, pág. 184.

[11] Sutherland, supra, pág. 198, citando de *People* v. *Mancuso*, 175 N.E. 177, (N.Y. 1931).

los límites de la necesidad. Nuestro deber es preservar, a menos que al así hacerlo pervirtamos."[12]

Otro poste indicador en cuanto a este problema de interpretación estatutaria debe ser examinado. "En ausencia de . . . una . . . [cláusula de separabilidad], la presunción es que la Legislatura tuvo en mente que la ley fuera efectiva en su totalidad . . . el efecto de una declaración estatutaria es crear en lugar de la presunción antes expuesta, la presunción contraria de separabilidad."[13] (Corchetes nuestros.) Sin embargo, es difícil, si no imposible, determinar hasta qué punto esta terminología de presunciones ha influído los resultados reales en casos específicos. Ciertamente la ausencia de la cláusula de separabilidad, como en el presente, no es necesariamente decisiva o aun predominante. En verdad, el juez de distrito dijo aquí que habría resuelto que toda la ley era nula aun teniendo ésta una cláusula de separabilidad. Tiene por miras establecer un criterio objetivo; sin embargo, como toda la ciencia en este campo, se presta indudablemente a un criterio subjetivo. Toda vez que la cláusula de separabilidad "es una mera ayuda; no un mandato inexorable",[14] algunas veces encontramos que se toma razón de ella, otras veces que se hace caso omiso de la misma. (*Frost* v. *Corporation Commission,* 278 U. S. 515; *Lynch* v. *United States,* 292 U. S. 571, 586). "En casos claros las presunciones no tienen importancia";[15] y nadie puede categóricamente decir qué es lo que inclina la balanza a favor de uno u otro lado. Y la contestación final es que "bajo cualquier regla, la determinación en definitiva se obtiene aplicando la misma fórmula, ¿Cuál fué la intención de los legisladores?"[16]

---

(12)*People ex rel. Alpha Portland Cement Co.* v. *Knapp et al.,* supra, págs. 207–8.

(13)*Williams* v. *Standard Oil Co.,* 278 U.S. 235, 241–2.

(14)*Dorchy* v. *Kansas,* supra, pág. 290.

(15)Stern, supra, pág. 125.

(16)*Carter* v. *Carter Coal Co.,* 298 U.S. 238, 312.

Una advertencia final, mencionada más arriba, es propia en este momento. Algunos de los casos se olvidan del hecho de que la fórmula no es lo que la Legislatura intentó. Es obvio que eso no se puede llevar a efecto en vista de la admitida nulidad de algunas disposiciones del estatuto. La fórmula es más bien lo que la Legislatura hubiera hecho de haber sabido que ciertas disposiciones del estatuto, según fué originalmente aprobado, eran inválidas.[17]

Con estas consideraciones preliminares en mente, pasemos a los hechos del presente caso. Citando casos conocidos sobre la materia (*Johnson* v. *State,* 37 Atl. 949 (N. J., 1897); *Riccio* v. *Hoboken,* 55 Atl. 1109 (N. J. 1903); *McFarland* v. *City of Cheyenne,* 42 P. (2d) 413 (Wyo., 1935); *Hill* v. *Wallace,* 259 U. S. 44;[18] *Williams* v. *Standard Oil Co.,* 278 U. S. 235; *Carter* v. *Carter Coal Co.,* 298 U. S. 238; *P. R. Tobacco Corp.* v. *Buscaglia,* 62 D.D.R. 811, 829), la corte de distrito concluyó que las otras disposiciones ·de la Ley núm. 33 están tan íntimamente relacionadas y entrelazadas con la disposición de que el Presidente ·de la Cámara y el Presidente del Senado serán miembros del comité que aprobará la erogación de fondos que al ser dichos funcionarios eliminados del comité mediante interpretación judicial debe caer la ley en su totalidad.

La corte inferior resolvió que ''la cláusula asignando fondos está íntimamente ligada con la creación del comité y la ·forma de hacer los desembolsos''. La corte primero. se basa en las limitaciones contenidas en el estatuto restringiendo la discreción del comité para desembolsar estos fondos. Estas limitaciones, afirma la corte de distrito, son que las ''calamidades'' para las cuales podían desembolsarse estos fon-

---

(17)Stern, supra, pág. 98; *Employers' Liability Cases,* 207 U.S. 463; *Lynch* v. *United States,* 292 U.S. 571, 586.

(18)Pero compárese *Chicago Board of Trade* v. *Olsen,* 262 U.S. 1, que ''ofrece un vívido ejemplo de la dificultad de reconciliar decisiones sobre separabilidad''. (Stern, supra, pág. 111.)

dos estaban enumeradas expresamente;[19] que tales "calamidades" debían trocarse en "necesidades públicas, inesperadas o imprevistas"; que el dinero no podía gastarse excepto para "el fin de proteger las vidas y propiedades de las gentes y el crédito público"; que el estatuto expresamente prohibía "se use el fondo sin el consentimiento previo de la Asamblea Legislativa para nuevas actividades gubernamentales, ni para aumentar o suplir directa o indirectamente, las asignaciones votadas para llevar a cabo servicios ordinarios del gobierno".[20]

Pero las limitaciones con las cuales la Legislatura restringió los desembolsos del Fondo de Emergencia pudieron muy bien haberse puesto como limitaciones sobre las erogaciones ejecutivas. Es decir, aplicando la fórmula que gobierna en estos casos—si la Legislatura hubiera sabido que tenía que rendir a la rama ejecutiva el poder para desembolsar estos fondos, el hecho de que estas limitaciones sobre desembolsos fueran incluídas en el estatuto no nos lleva necesariamente a la conclusión de que bajo estas circunstancias la Legislatura, de ningún modo, hubiera aprobado el estatuto. En verdad, de significar algo, tales rígidas restricciones señalan una nulidad parcial más bien que completa: un cuerpo legislativo muy bien puede ser persuadido para darle a un comité, en el cual estaba representado, carta blanca en cuanto al desembolso de fondos, especialmente si uno de sus miembros tenía un efectivo poder de veto; mientras que de advertírsele previamente a la Legislatura que sus miembros no podían actuar, la incorporación en el estatuto de tales limitaciones rígidas sería más procedente. Como cuestión de hecho, estas son las mismas restricciones sobre las cuales la corte de distrito descansó al resolver correctamente, como hemos visto, que la Ley núm. 33 no constituía una delegación inválida de poderes legislativos—que la Legislatura ha-

(19)Pero véase *infra* sobre este punto.

(20)La materia en comillas en este párrafo se tomó del artículo 4 de la Ley núm. 33.

bía insertado en dicha Ley suficientes normas para guiar al ejecutivo y para facilitarle la terminación de los detalles en la ejecución de la ley (*Luce & Co.* v. *Junta de Salario Mínimo,* 62 D.P.R. 452; *Pueblo* v. *Martínez,* 62 D.P.R. 734). Debemos confesar que estas disposiciones de la Ley núm. 33 nos llevan a exactamente la conclusión contraria a la que llegó la corte de distrito.

La corte de distrito también descansó en la disposición del estatuto de que se necesitaban cuatro votos de cinco para desembolsar los fondos. Esto significa, desde luego, que el desembolso de cualquier fondo debe ser aprobado por lo menos por un miembro legislativo. De esto concluye la corte de distrito que "La Legislatura no hubiera consentido jamás en permitir que se gastase el dinero sin que hubiese mediado la intervención y la *aprobación* previa de uno de sus presidentes. Para los legisladores, fueron tan, sino más, importantes las personas que habían de componer el comité de desembolsos, como las asignaciones mismas."

Debe admitirse en seguida que la disposición de la ley de que el comité no tomaría acción sin el voto por lo menos de uno de sus miembros legislativos, era una importante disposición del estatuto. Demuestra la determinación de la Legislatura para dar a sus miembros una voz poderosa en el desembolso de estos fondos. Pero sería pensar artificiosamente el resolver, sin ulterior examen, que esta disposición en cuanto a los cuatro votos es decisiva de la cuestión que estamos investigando ahora. Este argumento, al examinarse cuidadosamente, es en efecto una afirmación de que la disposición del estatuto en cuanto a los miembros legislativos se elimina del estatuto como inválida; que el requisito de una disposición en cuanto a cuatro votos *permanece* en el estatuto; que el comité consiste ahora de sólo tres miembros; y que el estatuto en total por tanto cae porque un comité formado por tres miembros nunca puede aprobar una resolución que requiere cuatro votos.

El defecto de este razonamiento nos parece obvio. Ambas disposiciones—los miembros legislativos y el requisito de cuatro votos—descansan en el mismo nivel. El propósito de cada uno es poner énfasis en la idea original de la Legislatura de participar en la erogación de los fondos por ella aprobados. Pero una vez que se resuelva que este método de desembolso es inconstitucional, no podemos seguir el razonamiento de la corte inferior de que la disposición sobre los cuatro votos sea predominante. Al contrario, dicha disposición está, en verdad—para emplear el lenguaje de los casos—"íntimamente relacionada" a la disposición en cuanto a que los legisladores sean miembros del comité. Si dos miembros del comité no pueden constitucionalmente actuar y por tanto debe eliminarse de la ley tal disposición, la disposición relacionada de que el comité—originalmente un comité de cinco—no pueda funcionar excepto por un voto de cuatro obviamente debe también eliminarse del estatuto. Pero queda todavía la pregunta—no obstante eso ¿hubiera la Legislatura deseado que el estatuto permaneciera en vigor sin estas dos disposiciones, de haber tenido conocimiento al tiempo de aprobar la ley que no podían incluirse en la misma?

Aunque citando extensamente del considerable número de casos sobre esta materia, la corte de distrito descarta con un párrafo la segunda decisión de *Springer* v. *Philippine Islands,* supra, que parece ser el de más semejanza al de autos de todos los que hemos examinado. Y en vista de la dificultad de reconciliar las decisiones en este campo y la tendencia de las cortes en decidir cada caso de esta naturaleza por sus propios méritos, somos afortunados en encontrar que el caso de *Springer* es casi idéntico al nuestro.

El caso de *Springer* envolvía recursos de la naturaleza de *quo warranto* impugnando el derecho para ocupar los cargos de directores de ciertas corporaciones en las cuales las Islas Filipinas poseían sustancialmente todas las acciones.

Dos de estas corporaciones eran The National Coal Co. y The National Bank. Se aprobó un estatuto disponiendo que el poder de votación de todas las acciones poseídas por el gobierno se confería exclusivamente a un comité, que consistía del Gobernador-General, el Presidente del Senado y el Presidente de la Cámara de Representantes. Se radicaron recursos para lanzar a los directores que habían sido elegidos por los dos miembros legislativos. Como ya se ha indicado, se decidió que las leyes en cuestión eran nulas toda vez que conferían funciones ejecutivas a miembros de la Legislatura. La corte de distrito siguió correctamente esta decisión.

Pero había una decisión adicional del caso de *Springer,* aún más importante a los fines de este caso. La opinión de la Corte Suprema de Filipinas contiene una excelente exposición de la regla sobre nulidad parcial en 50 Fil. 272, 306. Aplicando dicha regla a los hechos del caso de *Springer,* la corte, por voz del Juez Asociado Sr. Malcolm, dice a la pág. 307: "La Legislatura ha establecido legalmente una 'National Coal Company' y un comité con facultades para votar por las acciones del Gobierno en esa compañía, pero ilegalmente. ha dispuesto que dos de sus miembros ocupen· cargos en el comité. ¿Violentaría este tribunal la voluntal legislativa si la facultad de votar continuara solamente en manos del Gobernador-General hasta que la Legislatura dispusiera otra cosa diferente? Concluímos que no, por la razón de que el primordial propósito de la Legislatura era 'proseguir la explotación de depósitos carboníferos . . . y minar . . . y vender el carbón contenido en dichos depósitos' . . . El fin incidental de la Legislatura era disponer un ·método para votar por las acciones poseídas por el Gobierno en la 'National Coal Company.' "

Reconocemos que ésta no fué simplemente la cuestión del fracaso de una apropiación, como podría argüirse aquí, y que la Corte Suprema de Filipinas reforzó su conclusión, diciendo,

a las págs. 308–9 que "En el supuesto de que, sin embargo, toda la disposición que autoriza el comité con facultad de votar, sea considerada como eliminada, con todo, creemos que aún recaerá en el Gobernador-General el deber de proteger los intereses públicos y la propiedad pública. A él se le hace responsable de la ejecución de las leyes, y no sería fiel con ese deber si, por medio de inacción, los instrumentos del Gobierno dejaran de funcionar y si los bienes del Gobierno se permitiera que fueran disipados.".

La corte de distrito aparentemente descansaba en este punto citado últimamente cuando distinguió la decisión adicional del caso de *Springer* como sigue: "Es distinto el caso de *Springer* v. *Philippine Islands,* supra. Allí el gobierno filipino era dueño de unas acciones y se creó un comité de control para votarlas. Eliminados los legisladores alguien debía tener ese derecho y tratándose de un acto ejecutivo de gobierno nadie debía ejercitarlo sino aquél a quien la Ley Orgánica Filipina confería el *poder supremo ejecutivo.*"

Pero si las opiniones en este caso son examinadas cuidadosamente, encontramos que este limitado fundamento, que convenimos sería suficiente para sostener la conclusión de las cortes, no es en manera alguna la base exclusiva para dicha decisión. Al contrario, como hemos visto, la Corte Suprema de Filipinas manifestó más extensamente, antes de reforzar su conclusión con una mera exposición del limitado fundamento ya referido, su decisión más amplia de que la función ejecutiva gubernativa de poseer y controlar las acciones era el propósito principal de la legislación; que el método de votarla era sólo incidental a dicho propósito primordial; y que las cortes estaban por tanto obligadas a llevar a cabo dicho propósito primordial salvando el remanente del estatuto, siempre y cuando se pudiera hacer meramente eliminando las disposiciones ilegales y dejando en efecto un estatuto que se pudiera poner en práctica.

La Corte Suprema de los Estados Unidos, al confirmar las sentencias, empleó un lenguaje amplio. La corte dijo a las págs. 205–6: "Y también somos de opinión que los poderes ejercitados por la Legislatura de Filipinas están conferidos por la Ley Orgánica en el Gobernador-General. La intención del Congreso a ese efecto se desprende de las disposiciones de dicha ley ya mencionadas. Expuestas brevemente estas disposiciones son: Que el poder ejecutivo supremo está conferido en el Gobernador-General, a quien se le otorga la inspección general y el control sobre todos los departamentos y negociados del Gobierno Filipino; sobre sus hombres recae la responsabilidad de la fiel ejecución de las leyes de las Islas Filipinas; y mediante la disposición antes citada, todas las funciones ejecutivas deben estar directamente bajo el mando del Gobernador-General o dentro de uno de los departamentos ejecutivos bajo su inspección y control. Estas son concesiones lo suficientemente amplias para incluir los poderes que la Legislatura intentó ejercitar a través de las disposiciones de la ley que ahora revisamos.[21]

Nuestro dilema no es tan serio como el que tenían las cortes ante sí en el caso de *Springer*. Allí una junta de tres miembros en efecto fué disuelta con la eliminación de los dos miembros legislativos, dejando en funciones únicamente al Gobernador-General. Por tanto se hizo necesario escudriñar la Carta Orgánica para encontrar en ella puntos de apoyo,

---

[21] Parece a primera vista que indudablemente es una cuestión local el que un estatuto insular sea nulo parcial o totalmente. Stern dice, supra, págs. 91–3 que ". . . el que una ley estatal deba o no interpretarse [así] . . . es una cuestión de interpretación estatutaria, y el deber de interpretar leyes estatales descansa en las cortes estatales y no en las federales. [En verdad] . . . en casos recientes apelados de las cortes estatales, la Corte Suprema ha adoptado la técnica de devolver el caso a la corte estatal para la determinación de la cuestión de separabilidad". Sin embargo, la opinión en el caso de *Springer* no está modelada en el lenguaje familiar de sostener la interpretación de la corte territorial sobre cuestiones locales a menos que sea inescapablemente errónea. Al contrario, la Corte Suprema, al basar su decisión en la intención del Congreso en varias disposiciones del Acta Orgánica, parece que ejercita su criterio independiente al confirmar la Corte Suprema de Filipinas. Esto puede indicar que la

incluyendo el poder ejecutivo supremo, para sostener el derecho del Gobernador a actuar solo. En este caso no tenemos que descansar en las disposiciones de nuestra Carta Orgánica que concebiblemente pudieran justificar el expendio de dinero apropiado por la Legislatura sin una designación específica del departamento u otra agencia ejecutiva que, bajo la inspección del Gobernador tal como exige nuestra Carta Orgánica, desembolsaría los fondos en cuestión. Podemos salvar la legislación—y es nuestro deber hacerlo si encontramos que eso fué lo que la Legislatura hubiera tenido en mente de haberse enterado de que su disposición en cuanto a los miembros legislativos en el comité en unión a la disposición que la acompañaba de que uno de los votos legislativos era necesario para poderse actuar, era nula—mediante un procedimiento · que se asemeja considerablemente más a la. intención legislativa original que aquella empleada en el caso de *Springer*. En este último la eliminación de los dos miembros legislativos dejó las funciones ejecutivas únicamente en manos del Gobernador-General. En nuestro caso la eliminación de las disposiciones concernientes a los miembros legislativos hace que el artículo 7 de la Ley núm. 33 lea como sigue: ''No se harán desembolsos del 'Fondo Insular de Emergencia' sino mediante resolución adoptada por el voto afirmativo de . . . un comité constituído por . . . el Gobernador, . . . el Tesorero y el Auditor de Puerto Rico.''

---

Corte pudo creer que la decisión del caso dependía, en análisis final, de una interpretación del Acta Orgánica. De ser eso así—mediante paridad de razonamiento—aquí puede existir la misma situación, y en este caso por tanto concebiblemente puede estar envuelta una cuestión federal. De establecerse eso definitivamente, estaríamos obligados, ya concurriéramos con él o no, a seguir el caso de *Springer* (*Gallargo* v. *González*, 143 F. (2d) 947 (C.C.A. 1st, 1944); *cf.* *Puerto Rico* v. *Rubert Co.*, 309 U.S. 543, 549–50; *De Castro* v. *Board of Commissioners of San Juan*, 323 U.S. 451). Pero eso es otro aspecto interesante que no necesitamos explorar en este caso, en vista del hecho de que rechazamos cualquier intención de repudiar la segunda decisión en el caso de *Springer*. (Véase *Buscaglia* v. *Corte*, ante, pág. 11, según compara con *Massachusetts* v. *Mellon*, 262 U.S. 447).

Sin infringir la regla de que la realización de funciones ejecutivas debe asignársele a los miembros de la rama ejecutiva del Gobierno, el estatuto así interpretado no obstante retendría una pequeña fiscalización sobre el Gobernador—que falta enteramente en el resultado a que se llegó en el caso de *Springer*—al incluirse en el comité, tal cual fué la intención de la Legislatura, al Auditor, quien no es nombrado por el Gobernador sino por el Presidente, a quien en última instancia es responsable en vez de serlo al Gobernador. En verdad es difícil concebir un comité más apropiado. Después de todo, hemos resuelto que la Legislatura debe asignar este poder a la rama ejecutiva. Toda vez que el poder ejecutivo bajo nuestra Carta Orgánica emana del Gobernador, ciertamente no se infringe la política legislativa en retenerlo como miembro del comité. Y el Auditor y el Tesorero son los funcionarios fiscales del Gobierno y son los únicos jefes de departamento que están supuestos a no estar interesados en obtener asignaciones de fondos para proyectos a ser administrados por sus departamentos. Por tanto ellos son personas peculiarmente adecuadas para considerar tales solicitudes desde un punto de vista desprendido, imparcial y experto. Pero aún si el comité así constituído fuera poco menos que perfecto, no estaríamos inclinados a destejer la labor de la Legislatura más de lo que ya lo hemos hecho, a menos y hasta que dicho cuerpo hable por sí mismo.

Cuando examinamos el propósito de esta ley, surge aún más claro que es nuestro deber preservar la Ley núm. 33 en esta forma. Como hemos visto, la fórmula establecida en todos los casos, pero particularmente en el de *Springer*, parece ser: ¿Es el fin primordial de esta ley el expendio de fondos para afrontar calamidades públicas, con la manera de gastar el dinero importante pero incidental al fin primordial, o es la manera de gastar dicho dinero el fin primordial? Expuesta en esta forma, parece obvia la contestación. Aquí tenemos un estatuto con un fin preciso—una asignación de

fondos de reserva continua y permanente, depositados en fideicomiso y disponibles inmediatamente para afrontar necesidades públicas imprevistas y graves. Este fin no se afecta en lo más mínimo por el cambio exigido constitucionalmente en la manera de gastar tales fondos. ¿Es que vamos a decir que la manera de gastar los fondos supera—o aun iguala— en importancia su propósito, de tal suerte que la Legislatura hubiera dicho deliberadamente, de ser traído el asunto a su atención, al ser azotada esta Isla tropical por uno de los huracanes devastadores que nuestra historia demuestra se originan en esta área y pasan a través de la Isla dejando tras sí una comunidad en la miseria, que era su deseo dejar el fondo de $8,000,000, que había sido separado por ella para combatir tal desolación, intacto en el Tesoro porque sus miembros no podían participar constitucionalmente en su desembolso? No estamos preparados para atribuirle tan insensible actitud a la Legislatura. Si esa es la actitud de la Legislatura se manifestará en seguida cuando ésta se vuelva a reunir. Hasta que eso ocurra, preferimos creer que la Legislatura quiso decir lo que se desprende de la faz de la ley; es decir, que estaba interesada primordialmente en afrontar las necesidades públicas creadas por calamidades imprevistas y graves; que ella prefería que dos de sus miembros tuvieran participación en el expendio de dicho dinero; pero de no ser ello posible hubiera deseado que el estatuto práctico que todavía quedaba, fuera puesto en vigor con el fin de que a esta comunidad, le fuera suministrada la ayuda que específicamente había provisto para tales contingencias.

Ya hace mucho tiempo que pasó la época en que el poder del gobierno para aliviar la congoja de todo un pueblo era interpretada a regañadientes por las cortes (véase *Buscaglia v. Corte,* supra, en el que resolvimos que los gastos de ayuda por el gobierno son "necesarios para èl sostenimiento del Gobierno"). Además, anular totalmente una ley porque una de sus disposiciones no puede ponerse en vigor es un paso

muy radical. Preferimos el paso más conservador de dejar la ley en efecto segregándole la disposición impugnada. Ciertamente los casos demuestran que eso es lo que la mayoría de las cortes ha hecho cuando se han confrontado con este problema: Anular totalmente el estatuto por nulidad parcial es la excepción más bien que la regla general. En la gran mayoría de los casos las cortes salvan el remanente de la ley.[22]

Hasta dónde irán las cortes al poner en vigor la doctrina de nulidad parcial quedó demostrado por lo que en efecto hizo la Corte Suprema en el caso de *Springer*. Allí ya hemos visto, una junta de tres—el Gobernador-General, el Presidente de la Cámara y el Presidente del Senado—fué reducida por las cortes al Gobernador-General únicamente. Las cortes permitieron de este modo que las funciones ejecutivas allí envueltas fueran realizadas por la minoría de la junta, el Gobernador-General solamente. Un argumento análogo al argumento sobre los cuatro votos traído aquí fué hecho presumiblemente en aquel caso y rechazado. Es decir, si la legislación no se desfigura fatalmente sustituyendo un hombre por un comité de tres, de la misma manera un comité de tres puede reemplazar uno de cinco que por ley podía actuar únicamente con mayoría de cuatro votos. En cada caso una minoría del grupo tal cual fué constituído originalmente puede ahora tomar acción ejecutiva. También, lo que es más importante, allí la Corte Suprema de los Estados Unidos creyó que el fin primordial de que el gobierno operara los bancos y las compañías de carbón, debía ser salvado decidiendo que el estatuto era sólo parcialmente nulo, a pesar de un cambio tan radical en la maquinaria ejecutiva. ¿Vamos a decir que nuestra Legislatura no hubiera deseado una decisión similar sobre una cuestión que envolvía el socorro a toda la comunidad al ocurrir un desastre? Seguramente el cumplimiento de la política de nuestro estatuto sería más

---

([22]) Stern, supra, pág. 107.

probable mediante la nulidad parcial, como en el caso de *Springer,* más bien que mediante la nulidad total de la ley. ¿Quién podría decir que tal procedimiento está justificado para operar un negocio bancario o de carbón, pero que las medidas de socorro para un pueblo azotado por una calamidad no pueden ser tratadas de igual manera?

La corte de distrito razona también como sigue: "No es un secreto para nadie, y de ello tomamos conocimiento judicial, de que las asignaciones para el programa de emergencia de guerra fracasaron en la última sesión de la legislatura pasada precisamente por haber surgido discrepancias entre el senado y la cámara sobre la forma de constituir el organismo que había de administrar el fondo. *Estamos convencidos de que la legislatura no hubiera hecho las asignaciones sin tener participación en la forma de gastar el dinero . . :* No podemos creer que la legislatura hubiera aprobado la ley para que los desembolsos fueran hechos únicamente por el Gobernador, el Tesorero y el Auditor. Nos encontramos entonces a una situación idéntica a la de *People* v. *Tremaine,* supra, . . . " (Bastardillas nuestras.)

Es algo fuera de lo ordinario el determinar la intención legislativa para el 1932 por la actitud de una Legislatura diferente en 1944 hacia una ley diferente. Pero aceptando *arguendo* dicha fórmula como la cinta métrica para medir la intención legislativa, encontramos que la división en 1944 no fué de la misma clase: Ni la mayoría de la Cámara ni la del Senado hacían esfuerzo para imponer a la otra rama legislativa la condición inconstitucional de que sus miembros se sentaran en el comité de desembolsos que tendría a su cargo el programa. Por el contrario, la división fué sobre una cuestión enteramente diferente: la idoneidad de los miembros de la propuesta junta: *Buscaglia* v. *Corte,* supra. Pero lo que es más importante es que el récord en dicho caso sí demuestra una ferviente disputa en cuanto a la constitución del comité de desembolsos. Si bajo tales circunstancias

se hubiera aprobado finalmente un proyecto de ley que era inconstitucional en lo que se refiere a los miembros de la junta, convenimos que habría considerable base para estar de acuerdo con la posición de la corte inferior de que la Legislatura tuvo la intención de que si tal disposición no podía permanecer intacta en el estatuto, éste en total debería desaparecer.

Pero aquí no tenemos tal historia legislativa. Nada ha sido traído a nuestra atención para demostrar algún interés excepcional de la rama legislativa en la formación del comité que administraría la Ley núm. 33. Desde luego, la Legislatura reveló el deseo de que sus Presidentes se sentaran en el comité. Pero en manera alguna es claro que este deseo de la Legislatura de 1932 era tan intenso que hubiera decidido dejar a la Isla atribulada por los efectos de los huracanes y otras calamidades antes que renunciar a su participación en el desembolso de los fondos que había asignado para este fin. En verdad, podía añadirse, es la historia legislativa de lucha y la insistencia de la Legislatura de usurpar funciones ejecutivas, unido a una controversia existente por algún tiempo, la que parece haber motivado la decisión de la Corte de Apelaciones de Nueva York en el caso de *People* v. *Tremaine*, 168 N. E. 817 (N. Y., 1929).[23]

La corte de distrito descansó tanto en el caso de *Tremaine* que creemos conveniente examinar dicho caso en detalle. Empecemos por indicar que el caso de *Tremaine* contiene dos decisiones. Y aquí también, como en el caso de *Springer*, la corte inferior eligió seguir sólo una de ellas. Una de las decisiones de dicho caso es que la sección 139 de la Ley Estatal de Finanzas era nula en tanto en cuanto disponía que "Cuando, por actuación de la Legislatura, se crea o se reorganiza un departamento estatal . . . y se asigna una suma global para su mantenimiento y funcionamiento . . . ningún

---

[23] Además, aun en el caso de Tremaine, como veremos, continuaron en vigor otras asignaciones sin las condiciones nulas.

dinero así apropiado será usado como compensación para servicios personales . . . hasta que una lista de cargos y sueldos haya sido aprobada por el Gobernador, el Presidente del Comité de Hacienda del Senado y el Presidente del Comité de Medios y Arbitrios de la Cámara . . . ''. Después de emplear razonamientos con los cuales ya estamos familiarizados en este caso, la corte dice a la pág. 822:

"Por tanto todo lo contenido en los proyectos de asignación aquí envueltos que confiera poderes a los Presidentes de las Cámaras Legislativas para aprobar segregaciones es inconstitucional y nulo. Como claramente indica la controversia que el fin legislativo sería frustrado permitiendo que el poder de aprobar permaneciera únicamente en el Gobernador, todas las disposiciones para la aprobación de segregaciones contenidas en la sección 139 de la Ley Estatal de Finanzas deben ser declaradas nulas . . . *En lo que respecta a las asignaciones propiamente dichas, éstas pueden ser separadas de las partes inconstitucionales de las leyes, y son por consecuencia la ley del estado.* Tanto la Legislatura como el Gobernador claramente tuvieron la intención de que de cualquier modo los departamentos se sostuvieran adecuadamente y se les asignara fondos de conformidad. *La Legislatura no puede incluir condiciones nulas a una Ley de Asignaciones. Si trata de hacerlo, sucumbe el intento y no la asignación.* . . . La Ley Estatal de Finanzas, sección 139, y la sección 11 del Capítulo 593, Leyes de 1929, que fué vedada, y todas las disposiciones sobre segregaciones contenidas en las Leyes de asignaciones de 1929, son por tanto inconstitucionales y nulas, aunque las asignaciones propiamente dichas, con las excepciones especificadas más adelante, son válidas." (Bastardillas nuestras).

La corte inferior omite citar la porción arriba copiada de la opinión en el caso de *Tremaine.* Sin embargo descansa en el párrafo inmediatamente posterior que dice como sigue (págs. 822-3):

"Una de dichas leyes de asignaciones merece atención especial. El poder legislativo asigna el dinero, y, excepto en lo que se refiere a las asignaciones legislativa y judicial, el poder administrativo o ejecutivo gasta el dinero asignado. Los miembros de la Legislatura no pueden ser nombrados para gastar dinero. De ahí que todo lo contenido en las asignaciones en el Capítulo 93, Leyes de 1929, para

la construcción de edificios públicos hechas a y a ser gastadas por la comisión estatal de edificios y oficinas, creada por el Capítulo 5, Leyes de 1926, y compuesta por el Gobernador, como Presidente, el Presidente Pro Témpore del Senado, el Presidente de la Cámara, el Presidente del Comité de Hacienda del Senado, el Presidente del Comité de Medios y Arbitrios de la Cámara, el Superintendente de Obras Públicas, y el Arquitecto del Estado, sufre del vicio de nulidad. Una mayoría de los miembros de tal comité son funcionarios legislativos que actúan ex oficio, y por tanto, ocupan cargos civiles de carácter administrativo desde sus sitios en la Legislatura, que son nulos. Cuando se les despojó de sus cargos o funciones como miembros de tal comisión, ésta es mutilada e invalidada, por lo menos en lo que respecta a sus funciones para gastar el dinero . . . Tales partidas son. $550,000 para el edificio de oficinas estatales en Buffalo, y $3,250,000 para el edificio de oficinas estatales en la ciudad de Nueva York.''

El único motivo que expone la Corte, de Apelaciones de Nueva York para eliminar esta partida de las muchas que dejó intactas en dicho caso es que ''Una mayoría de los miembros . . . disfrutan de . . . nombramientos . . . inválidos . . . Cuando son despojados de sus cargos . . . la comisión queda mutilada . . . ''. Pero eso, como hemos visto, no impidió a la Corte Suprema de los Estados Unidos permitir que el Gobernador-General asumiera solo las funciones de un comité de tres. Además, en el presente caso, los tres miembros ejecutivos, una mayoría del comité, permanecen en funciones, permitiendo que el comité siga funcionando, aunque es cierto en nuestro caso que la mayoría contemplada por el estatuto para acción afirmativa—cuatro—ya no es posible. De cualquier modo, la mejor contestación a este argumento, como ya hemos visto, es que el factor de mayoría no es dominante o aún decisivo—el fin primordial de la Legislatura al aprobar la ley permanece por encima de todo.

Pero aun asumiendo que estuviéramos conformes con el caso de *Tremaine,* ¿por qué asimilar la situación del caso de autos a la construcción de dos edificios para oficinas más bien que a las asignaciones ordinarias de los departamentos

del gobierno? En el presente caso está envuelta una gran suma depositada en fideicomiso que es una asignación permanente y continua que es constantemente reintegrada y aumentada [24] y que, la Legislatura previó, estaría disponible inmediatamente para afrontar el embate inesperado de las calamidades que la experiencia nos ha enseñado azotan de cuando en vez a esta comunidad. En verdad, podría sostenerse airosamente que una asignación permanente y continua de esta naturaleza goza de una dignidad mayor que las leyes ordinarias de asignaciones, ya que esto permite al comité gastar sus fondos sin recurrir para ello a la Legislatura de año en año. Y aunque gastada sólo intermitentemente, tal asignación es con certeza tan importante como aquellas "necesarias para el sostenimiento del gobierno." (*Buscaglia* v. *Corte,* supra). Por tanto procede argumentar que si por ejemplo se hiciera una disposición regular todos los años en los presupuestos de los departamentos de Interior y Agricultura asignando una cantidad para afrontar las contingencias enumeradas en la Ley núm. 33, cualesquiera requisitos en dichas asignaciones de que miembros de la Legislatura se sentarán junto a los dos Comisionados y al Gobernador para disponer de los fondos, sería—de conformidad con el lenguaje del caso de *Tremaine*—"condiciones nulas en una Ley de Asignación" pero sin embargo, "las asignaciones propiamente dichas . . . [serían] válidas."

La médula de la cuestión es que nada encontramos en el caso de *Tremaine* que nos autorice para imputarle a nuestra Legislatura la intención de que, a pesar de todas las rígidas limitaciones y restricciones contenidas en nuestra ley para guiar, limitar y, de ser necesario, paralizar las actuaciones del ejecutivo que la corte inferior y las partes admiten de plano son más que suficientes para establecer correctas normas legislativas que rijan la conducta ejecutiva y que por ningún esfuerzo de imaginación puedan ser catalogadas como

---

([24])Artículo 3 de la Ley núm. 33.

un poder ilimitado—la Legislatura, al tener conocimiento de que su precaución final de participación directa en los desembolsos de fondo era inconstitucional, en efecto dijo, o hubiere entonces dicho, en aquel caso, toda esta ley, proveyendo para el socorro de emergencia debido a calamidades, tales como huracanes, guerras, plagas y terremotos, sería nula.

La próxima contención hecha por Rodríguez Pacheco fué que, aún asumiendo que la Ley núm. 33 era válida parcialmente, la asignación de fondos para aliviar a la comunidad de los efectos de una sequía no estaba autorizada por los términos del artículo 4 que dispone que "el 'Fondo Insular de Emergencia' será aplicado a afrontar necesidades públicas . . . imprevistas, causadas por *calamidades, tales como guerras, huracanes, terremotos y plagas . . .*". (Bastardillas nuestras). La corte de distrito rehusó considerar esta contención, en vista del hecho de que había resuelto que la ley era nula totalmente. Esto constituyó una debida abstención judicial. Pero como hemos sostenido la ley en parte, tenemos que considerar esta contención.

Este punto nos impresiona muy poco. Ante la corte inferior se adujo considerable prueba en cuanto a la severa naturaleza de la sequía en Puerto Rico durante el pasado año y de sus desastrosos efectos sobre toda nuestra economía. En verdad, esta situación fué tan notoria como para no necesitar prueba alguna—tomamos conocimiento judicial de que fué la más intensa sequía en nuestra historia desde la soberanía americana. Su efecto fué y continúa siendo uno de los acontecimientos de la vida de esta comunidad. Con esto el contribuyente está de acuerdo. Pero afirma que este hecho es irrelevante, toda vez que el artículo 4 no enumera específicamente las sequías como una de las calamidades contempladas por la Legislatura que exija el expendio de dinero del Fondo de Emergencia. Interpretar el artículo 4 en esta forma restringida equivaldría por cierto a interpre-

tar a regañadientes una amplia medida social. Afortunada-
mente, el propio lenguaje del artículo no requiere tan limi-
tada interpretación. El propio contribuyente aún concede
que una sequía es una "calamidad". Y nada encontramos
en el artículo que limite el socorro provisto en dicha ley ex-
clusivamente a aquellas calamidades enumeradas expresa-
mente en la misma. Por el contrario, es claro que las cala-
midades enumeradas en el estatuto están así enumeradas
sólo como ilustrativas y como medio de ejemplos. Ese es
obviamente el significado de la frase "tales como" que en-
contramos antes de la lista de calamidades contenidas en el
estatuto. Esta fué una previsión constructiva de parte de
la Legislatura. Por su naturaleza las calamidades son ines-
peradas. Sería en verdad muy arriesgado tratar de mencio-
nar en detalle en tal ley cualquier posible contingencia. Si
fuéramos azotados inesperadamente por un enorme fuego,
una inundación, una explosión de dinamita, o un ataque aéreo
en tiempos de paz, ¿se atrevería alguien a protestar de que
el comité empleara el Fondo de Emergencia para amparar
a la comunidad? No vemos diferencia alguna entre estas
situaciones y la de la sequía del año pasado. Ninguna de
ellas está enumerada en los ejemplos de calamidades que
ofrece el artículo 4. Pero indudablemente todas ellas caen
dentro de la categoría de calamidades, siendo meros ejem-
plos aquellas específicamente enumeradas como tales. (Véanse
*City of Muskegon Heights* v. *Danigelis,* 235 N. W. 83 (Mich.,
1931) ; *Rummens* v. *Evans,* 13 P. (2d) 26 (Wash., 1932)).

Esta conclusión en manera alguna se afecta por el hecho
de que la Ley núm. 33 fué enmendada en 1942 insertándole
las guerras como una de las calamidades específicamente
enumeradas. Quizás la Legislatura creyó que toda vez que
la guerra, contraria a otras calamidades, no es un acto de
la naturaleza, era aconsejable, dentro de un exceso de pre-
caución, enumerarla específicamente. Lo más probable es
que fué incluída en el estatuto como una expresión de pa-

triotismo y de la determinación de autoridades locales en hacer nuestra parte en el esfuerzo de guerra. De cualquier modo, a nuestros fines, meramente ocupó su sitio como uno de los ejemplos de las calamidades y no invalida el razonamiento en este caso.[25]

▬ Finalmente, los ataques en cuanto a la capacidad del Gobernador Interino para ocupar el cargo en lo que se refiere a su nombramiento y a la validez de su actuación al votar como tal la resolución de 22 de mayo, sólo requieren escasa consideración. No nos detendremos a examinar las muchas cuestiones levantadas por ambas partes a este efecto, en vista del hecho de que el récord demuestra que de los tres miembros del comité que podían actuar válidamente, dos— el Auditor y el Tesorero—votaron la resolución. Toda vez que las actuaciones de un comité de tres están regidas bajo las reglas corrientes por dos miembros del mismo, no vemos motivo para considerar estas cuestiones. Esto no quiere decir que a las agencias ejecutivas insulares, de las cuales el Gobernador es miembro, deba instárseles de ordinario como cuestión de práctica administrativa a reunirse en su ausencia, simplemente porque tienen el poder de imponerse a su criterio. Pero aquí de hecho formó parte del comité un funcionario que votó como Gobernador Interino. También, subsiguientemente el Gobernador permitió a los Comisionados de Agricultura e Interior, que ocupan sus cargos a voluntad de aquél, gastar estos fondos de conformidad con la resolución hasta que se les prohibió por la corte inferior; y el propio Gobernador ha comparecido como parte en este caso, a través del Procurador General, para defender la resolución del comité. Bajo dichas circunstancias no hay base para que

---

(25)La determinación de la cuestión de si los medios adoptados por el comité para remediar los efectos de la sequía eran los mejores bajo las circunstancias no es una que cae dentro de nuestra incumbencia. Nadie afirma que fueron enteramente irrazonables. Por tanto no estamos en libertad de substituir nuestro criterio por el del comité en una cuestión que obviamente pertenece a la discreción administrativa.

las cortes intervengan con la actuación del comité que tenía la aprobación de una mayoría del mismo.

*La resolución de la corte de distrito concediendo el injunction preliminar será revocada y devuelto el caso para ulteriores procedimientos no inconsistentes con esta opinión.*